**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NELSON H. ANTHOINE,
              *Plaintiff-Appellant,*

              v.

NORTH CENTRAL COUNTIES
CONSORTIUM; LORI BROWN; CINDY
NEWTON,
              *Defendants-Appellees.*

No. 08-16803

D.C. No.
2:06-cv-01169-
JAM-KJM

OPINION

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Submitted November 5, 2009*
San Francisco, California

Filed May 24, 2010

Before: Alfred T. Goodwin and William A. Fletcher,
Circuit Judges, and Richard Mills,** District Judge.

Opinion by Judge William A. Fletcher

---

*The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

**The Honorable Richard Mills, Senior United States District Judge for the Central District of Illinois, sitting by designation.

**COUNSEL**

Michael Edward Adams, Redwood City, California, for the appellant.

Mark Henry Van Brussel, Joel Van Parys, SEYFARTH SHAW FAIRWEATHER & GERALDSON, Sacramento, California, for the appellees.

**OPINION**

W. FLETCHER, Circuit Judge:

In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Supreme Court held that public employees do not have First Amendment protection for statements made pursuant to their official duties. In this case we consider the application of *Garcetti* to plaintiff-appellant Nelson Anthoine, a low-level employee who jumped the chain of command to report directly to the chairman of his employer's governing board that his immediate supervisor had misrepresented the status of the employer's compliance with its legal obligations. Anthoine was disciplined and terminated soon thereafter. Anthoine brought various claims in federal district court, and the court granted summary judgment against Anthoine. We hold that Anthoine has presented triable issues of fact on his First Amendment retaliation claim, and we reverse the summary judgment on that claim. We affirm the summary judgment against Anthoine on his gender discrimination and wrongful termination claims.

## I.   Background

In reviewing the summary judgment against Anthoine, we take undisputed facts as true and consider disputed facts in the light most favorable to him. *Cripe v. City of San Jose*, 261 F.3d 877, 881 n.1 (9th Cir. 2001).

Defendant-appellee North Central Counties Consortium ("NCCC") is a public entity created by five California counties to administer the Workforce Investment Act ("WIA"), 29

U.S.C. § 2801 *et seq.* NCCC receives money from the state and federal governments to fund programs that provide workforce development activities. Defendant-appellee Lori Brown served as the interim Executive Director of NCCC from January 27, 2005 to December 31, 2005. Defendant-appellee Cindy Newton worked as NCCC Program Director, directly supervising Anthoine and two other Program Analysts. Anthoine worked as a Program Analyst at NCCC from 1988 until his termination in May 2005. His duties included working with NCCC-funded programs to ensure compliance with the WIA.

Anthoine received seven written performance reviews between 1988 and 2001. His evaluations ranged from "improvement needed" (second on a five-part scale) to between "standard" and "above standard" (between third and fourth on the scale). Between 1998 and 2002, Anthoine received three reprimands. In 1998, he was given a counseling memo for his delay in commencing a project and for directly contacting Deputy Director Bill Rottman, rather than his supervisor Newton, to get clarification of an instruction. In 2000, he was criticized for having directly emailed Executive Director Charles Peterson to express his concerns about how the office was run and his desire to be treated with respect and to be included in decision-making processes. In March 2002, he received a counseling memo for negligence in failing to prepare an inventory list in a timely manner. This memo warned that future unacceptable work performance would result in disciplinary action.

From 2002 to early 2004, Anthoine worked largely from home on a job-survey project. He returned to compliance-monitoring duties at the NCCC office in February 2004. In October 2004, Anthoine was admonished by his supervisor Newton for not following directions on four occasions between June and October 2004. Newton warned him that further misbehavior could result in disciplinary action.

On January 25, 2005, Anthoine arranged a meeting with Gary Freeman, the chairman of NCCC's governing board, at a restaurant after work. Anthoine reported to Freeman that Newton had falsely reported to the board that NCCC was current in reporting to the state certain data from NCCC's case management system ("CMS"). Anthoine also expressed concerns about flaws in CMS, complained that his work was "not being considered properly," and complained about Rottman, the Deputy Director of NCCC. Anthoine called Freeman the next day to reiterate his concerns.

Freeman communicated Anthoine's concerns to Brown, who became interim executive director on January 27, 2005. Brown met with Anthoine soon thereafter. She investigated and confirmed that there was a problem with CMS and data reporting. Brown confronted Newton, asking her why she had incorrectly reported that the data was current.

On February 7, 2005, Newton gave Anthoine a verbal warning for a "pattern of incidents of insubordination." Anthoine had previously been reprimanded for "failure to follow instructions," but the word "insubordination" had been used only once before, in the 1998 counseling memo. As later memorialized in a memo, Newton's February 7 warning cited the four 2004 incidents that had been listed in the earlier October 2004 warning, as well as an additional incident that occurred in January 2005. (The memo states that the additional incident occurred in January 2004, but it appears to have occurred in January 2005.)

On February 14, 2005, Anthoine responded to Newton's verbal warning by giving her a 207-page document. In an email to Brown, Newton commented, "Looks like good insomnia reading. Here's another whirl on Mr. Toad's wild ride." Brown responded, "wow . . . 207 pages?! I cannot wait for the revision of those policies!!!"

On February 17, 2005, Brown informed Anthoine that there would be no response to his document. On February 24,

Brown, Newton, and Anthoine met. On February 25, Anthoine submitted a formal grievance to Brown regarding his work assignments. He also challenged the February 7 disciplinary action and requested that he be included in meetings when Newton met jointly with the two other Program Analysts she supervised. Anthoine contends that the other analysts met to discuss matters that affected his job, but that they met without him because he was male and had "male qualities" and because they wanted to talk about personal matters. In Anthoine's view, Brown tended to treat male employees in a "gruff and standoffish" manner, while having a "greater sort of leniency or flexibility in appraisals of behavior of the women in the office."

On March 25, 2005, Brown denied Anthoine's grievance, including his request that he always be included in meetings between Newton and the other analysts. However, she stated that NCCC would begin holding periodic program analyst meetings where they could "share ideas and resolve issues as a team." On April 7, 2005, Anthoine appealed Brown's denial of his grievance to the governing board. On May 16, 2005, the full governing board heard Anthoine's grievance. Anthoine did not tell the board or other NCCC personnel of his complaints of gender discrimination, but he testified in his deposition that he had such discrimination in mind when he complained of unfair treatment by Newton and Brown. The board unanimously denied the grievance.

Meanwhile, on March 17, 2005, Anthoine had been given his evaluation for 2004. He received an "unsatisfactory" rating, the lowest rating on a new four-part scale. An earlier draft of the evaluation, originally prepared for delivery on January 28, 2005, would have given him a "needs improvement" rating, the second-lowest rating. Brown had been dissatisfied with the "needs improvement" rating and instructed Newton to revise it downward to "unsatisfactory." Brown requested similar adverse revisions in the performance evaluation for Ed Morrison, the only other low-level male

employee. She concurred in "excellent" overall ratings for the two female Program Analysts and for Newton.

At about this time, Anthoine told Newton and Brown of his concern that Upward Bound, one of the programs that Anthoine monitored, was misusing a portion of its NCCC funds in violation of the WIA. Newton and Brown disagreed with Anthoine but agreed to contact NCCC's state WIA liaison for advice. Newton states that she believes that she told Anthoine not to discuss his concern with Upward Bound staff in advance of receiving an answer from the state liaison. Anthoine denies that she gave him any such direction.

On April 20, 2005, Anthoine attended a monitoring meeting at Upward Bound during which he told staff members Maria Moreno and Dave Ferguson that their manner of using funds for classroom training might not be allowable under the WIA. He also told them that, in his personal opinion, Upward Bound's use of funds seemed excessive when programs in other counties were starved for funds. He told them that he was trying to influence NCCC to direct more of its funds to work-site experiences for disadvantaged youth, in contrast to the Upward Bound program which provided academic training.

On May 5, 2005, Moreno called Newton, telling her about Anthoine's comments regarding the possible disallowance of wages for classroom training. In a written follow-up email sent on May 10 at Newton's request, Moreno stated that Anthoine "informed us that we were most likely in violation of the WIA regulations," and that "it was a possibility we would have to return funds to the consortium for money already spent or money that would be spent this summer on class time." On May 11, Ferguson emailed Newton, indicating that Anthoine had stated that Upward Bound was in jeopardy of having to return funds that it planned to spend in the future.

On May 13, 2005, Newton and Brown met with Anthoine to discuss Upward Bound's complaints. At this meeting, Newton stated her belief that she had told Anthoine not to discuss his concern about the use of state funds with Upward Bound staff; Anthoine denied that she ever gave him such direction. Anthoine also denied having spoken to Upward Bound about any risk of having to repay previously expended funds, acknowledging only that he offered guidance about planning for future expenditures.

On May 16, 2005, Brown informed the NCCC governing board that she had decided to discharge Anthoine. The board ratified Brown's decision. On May 20, NCCC gave Anthoine notice that he was terminated effective May 26, because of unsatisfactory performance, insubordination, and discourteous treatment of the public or other employees. Bill Rottman and Ed Morrison, the only other men on the eleven-person NCCC staff, were terminated on the same day as Anthoine.

Anthoine brought suit in federal district court, asserting, *inter alia*, claims for retaliation in violation of the First Amendment; gender-based employment discrimination in violation of the Equal Protection Clause; and wrongful discharge in violation of California law. The district court granted summary judgment against Anthoine on all three of these claims. Anthoine timely appealed.

## II.   Standard of Review

We review *de novo* a grant of summary judgment. *Huppert v. City of Pittsburg*, 574 F.3d 696, 701 (9th Cir. 2009).

## III.   Discussion

### A.   First Amendment Claim

Anthoine contends that he engaged in protected speech when he informed Freeman, the chairman of NCCC's board,

that NCCC was in violation of its legal obligations and that Newton had misrepresented to the board that NCCC was current in meeting those obligations. Anthoine contends that he was subjected to a "cascade of adverse employment actions" in retaliation for having communicated this information to Freeman.

**[1]** "The First Amendment shields a public employee if he speaks as a citizen on a matter of public concern." *Huppert*, 574 F.3d at 702. However, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). We employ a "sequential five-step series of questions" to determine whether an employer impermissibly retaliated against an employee for protected speech:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009); *see Huppert*, 574 F.3d at 702 (applying *Eng* test). For the reasons that follow, we conclude that summary judgment should not have been granted against Anthoine on his First Amendment retaliation claim. We analyze the five steps of the test in turn.

### 1.    Matter of Public Concern

"Speech involves a matter of public concern when it fairly can be said to relate to any matter of political, social, or other

concern to the community." *Huppert*, 574 F.3d at 703 (internal quotation marks and alterations omitted). "Public concern" does not have a precise definition, but "the essential question is whether the speech addressed matters of 'public' as opposed to 'personal' interest." *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009). Subjects of public concern include "unlawful conduct by a government employee" and the "misuse of public funds, wastefulness, and inefficiency in managing and operating government entities." *Huppert*, 574 F.3d at 703-04 (citing cases). "[S]peech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of public concern." *Eng*, 552 F.3d at 1070 (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003)) (internal quotation marks omitted). The public concern inquiry is a question of law. *Eng*, 552 F.3d at 1070. A court must consider "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). Of these, content is the most important factor. *Desrochers*, 572 F.3d at 710.

**[2]** We hold that Anthoine's speech qualifies as a matter of public concern. A report regarding the agency's failure to comply with its legal obligations is clearly relevant to the public's evaluation of NCCC's performance. Moreover, misrepresentation to the governing board of a public entity by an employee of that entity falls squarely within the subjects of public concern delineated in *Huppert*. 574 F.3d at 703-04.

It is not determinative that Anthoine did not air his concerns publicly. *See Thomas v. City of Beaverton*, 379 F.3d 802, 810 (9th Cir. 2004) ("That [plaintiff] chose to convey her views privately rather than publicly is not determinative of whether her expression is entitled to protection."); *see also Connick*, 461 U.S. at 148 n.8 (noting that the "right to protest . . . a matter inherently of public concern[ ] is not forfeited by" use of a private rather than public forum); *Givhan v. W.*

*Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979) ("Neither the [First] Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public."). Anthoine expressed his concerns about Newton's misrepresentation directly to Freeman, the chairman of the board, because he believed (correctly) that Freeman would be able to address and correct the problem. *See Thomas*, 379 F.3d at 811.

### 2.    Speech as a Private Citizen or Public Employee

"Statements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Eng*, 552 F.3d at 1071 (internal quotation marks omitted) (citing cases). Statements do not lose First Amendment protection simply because they concern "the subject matter of [the plaintiff's] employment." *Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006); *see Garcetti*, 547 U.S. at 421. However, "speech which 'owes its existence to an employee's professional responsibilities' is not protected by the First Amendment." *Huppert*, 574 F.3d at 704 (quoting *Garcetti*, 547 U.S. at 421). "[W]hether the plaintiff spoke as a public employee or a private citizen [ ] is a mixed question of fact and law." *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008).

In *Garcetti*, Ceballos, a deputy district attorney, wrote a memo informing his supervisors that a search warrant affidavit contained serious misrepresentations. The supervisors allegedly retaliated against him as a result. The Court held that Ceballos's speech was not protected by the First Amendment because the memo was written pursuant to his official duties.

In *Freitag v. Ayers*, Freitag was a prison guard who first complained to officials in her chain of command that inmates

were sexually harassing her. After the officials failed to take action, Freitag eventually wrote to the Director of the prison system, to a state senator, and to California's Inspector General. Because Freitag was required to report inmate misconduct, we concluded that her complaints to the officials in the chain of command were made pursuant to her official duties. We held, however, that her speech to the state senator and the Inspector General was protected because her official duties did not include reporting to them. We remanded for a determination of whether Freitag's letter to the Director of the prison system was sent pursuant to her official duties because we could not determine based on the record before us "whether prison guards are expected to air complaints . . . all the way up to the Director." 468 F.3d at 546.

In *Marable v. Nitchman*, 511 F.3d 924 (9th Cir. 2007), Marable was a Chief Engineer in charge of the engine department of a Washington State ferry. Marable complained of corrupt financial practices by managers in the ferry system. We held that his internal and external complaints, made to the Maintenance Director of the ferry system, a former CEO of the ferry system, a Washington Department of Transportation auditor, and the Washington Executive Ethics Board, were protected speech. We held that complaining about corrupt practices of higher-level officials was entirely outside the duties of a ferry engineer.

[3] In the case before us, appellees have not shown that Anthoine's statements to Freeman were made pursuant to his official duties, that is, that his speech was "the product of performing the tasks the employee was paid to perform." *Eng*, 552 F.3d at 1071 (internal quotation marks omitted). Anthoine discovered Newton's misrepresentation about NCCC's compliance by reading generally distributed minutes of a board meeting that he had not attended. There is no evidence in the record that Anthoine had a duty, like the prison guard in *Freitag* and the deputy district attorney in *Garcetti*, to report such misconduct within the proper channels. *See Garcetti*,

547 U.S. at 421 (concluding that the distinguishing consideration was that in sending the memo, Ceballos "spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case"); *Alaska v. EEOC*, 564 F.3d 1062, 1070 (9th Cir. 2009) (holding that an aide to the governor who spoke publicly about misconduct was not acting within the scope of her official duties, because those duties "didn't require her to complain"). But even assuming that Anthoine had such a duty, there is no evidence in the record that his speech directly to the chairman of the NCCC board was within the scope of his duties. Accordingly, we hold that Anthoine has presented an issue of fact as to whether he spoke as a private citizen, rather than a public employee, in reporting Newton's misrepresentations to Freeman.

### 3.   Substantial or Motivating Factor for Adverse Employment Action

"Th[e] third step is purely a question of fact." *Eng*, 552 F.3d at 1071. In a First Amendment case, "[t]o constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind." *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003). "Depending on the circumstances, even minor acts of retaliation can infringe on an employee's First Amendment rights." *Id.* A plaintiff can establish a valid claim of retaliation by showing that "the actions taken by the defendants were reasonably likely to deter [plaintiff] from engaging in protected activity under the First Amendment." *Id.* at 976 (internal quotation marks and alterations omitted). Anthoine was subjected to a series of adverse actions following his statements to Freeman: a verbal warning for a "pattern of incidents of insubordination," an unsatisfactory evaluation, and termination of his employment.

**[4]** To show that retaliation was a substantial or motivating factor behind an adverse employment action, a plaintiff can

(1) introduce evidence that the speech and adverse action were proximate in time, such that a jury could infer that the action took place in retaliation for the speech; (2) introduce evidence that the employer expressed opposition to the speech; or (3) introduce evidence that the proffered explanations for the adverse action were false and pretextual. *Id.* at 977. Anthoine relies on the first and third prongs.

**[5]** Anthoine has provided evidence of a very close temporal link. His statements to Freeman were made on January 25, 2005. The process of downgrading his performance evaluation began within days, he was disciplined on February 7, and he was given an "unsatisfactory" rating on March 17. He was then given notice of his termination on May 20.

**[6]** We have held that proximity in time may support an inference of retaliation sufficient to survive summary judgment. *See Allen v. Iranon*, 283 F.3d 1070, 1077-78 (9th Cir. 2002) ("This proximity in time constitutes circumstantial evidence of retaliatory motive."). In the analogous Title VII context, we have come to a similar conclusion. *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008) ("We have held that 'causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.' " (quoting *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002)); *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000) ("[W]hen adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred.").

**[7]** In *Coszalter*, we cautioned that courts should not engage in a mechanical inquiry into the amount of time between the speech and alleged retaliatory action. Reversing a district court's determination that adverse employment actions taken three to eight months after protected speech were too distant in time to support an inference of retaliation,

we held that "[w]hether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances." 320 F.3d at 977-78. Contrary to appellees' suggestion, however, *Coszalter* did not repudiate *Allen*'s holding that proximity in time may constitute circumstantial evidence of retaliatory motive. Rather, it rejected adoption of a bright-line rule providing that a certain period of time is per se too long to support an inference of retaliation. *See id.* at 977-78.

**[8]** Anthoine has also provided evidence showing that appellees' "proffered explanations for the adverse employment action[s] were false and pretextual." *Id.* at 977 (quoting *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 752 (9th Cir. 2001)). During the seventeen years Anthoine worked at NCCC, he was hardly a model employee. He questioned his superiors, failed to follow their directions, and undertook, to their dismay, "improvements" on his own initiative. But only after his statements to Freeman informing him of Newton's misrepresentation did Anthoine receive discipline for a "pattern of incidents of insubordination" (four out of five of which had already been documented without use of the word "insubordinate"), a downwardly revised performance rating of "unsatisfactory," and notice of termination.

The facts in Anthoine's case are similar to those in *Allen*, in which we held that the evidence was sufficient to support an inference of retaliatory motive:

> Allen had worked at Halawa for years, during which he was involved in several disputes over security, without his performance being found deficient enough to warrant discipline or an Internal Affairs investigation. After he began to criticize the prison under Hall's administration, his conduct was found to be so serious that it warranted Internal Affairs investigations and a lockout. This proximity in time constitutes circumstantial evidence of retaliatory

motive. The protected statement was made eleven months before the first lockout and the initiation of the Internal Affairs investigations. Although an inference from temporal proximity would have been stronger had the gap in time been smaller, an eleven-month gap in time is within the range that has been found to support an inference that an employment decision was retaliatory.

283 F.3d at 1077-78 (internal citation omitted).

**[9]** There is thus evidence in the record from which a jury could conclude that the disciplinary actions taken against Anthoine were reasonably likely to deter him from engaging in activity protected by the First Amendment. *See Coszalter*, 320 F.3d at 976-77 (describing adverse employment actions). And there is evidence from which a jury could conclude that these actions were taken to retaliate against him for his statements to Freeman.

### 4.    Adequate Justification

**[10]** Once a plaintiff has satisfied the first three steps, the burden shifts to a defendant to show whether it "had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418. For a court "to find that the government's interest as an employer in a smoothly-running office outweighs an employee's first amendment right, defendants must demonstrate actual, material and substantial disruption, or reasonable predictions of disruption in the workplace." *Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009) (internal quotation marks and alteration omitted). This issue is ultimately a legal determination but often turns on questions of fact. *Eng*, 552 F.3d at 1071-72. Appellees have not attempted to show that Anthoine's statements to Freeman caused any disruption or could have been predicted to cause a disruption.

### 5.  Adverse Employment Action Absent the Protected Speech

**[11]** If defendants fail to carry their burden on the fourth part of the test, they are nonetheless entitled to summary judgment if they can demonstrate that they "would have reached the same adverse employment decision even in the absence of the employee's protected conduct." *Eng*, 552 F.3d at 1072. "In other words, [they] may avoid liability by showing that the employee's protected speech was not a but-for cause of the adverse employment action." *Id.*; *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). "This question relates to, but is distinct from, the plaintiff's burden to show the protected conduct was a substantial or motivating factor." *Eng*, 552 F.3d at 1072.

**[12]** The "but-for causation inquiry" is "purely a question of fact." *Robinson*, 566 F.3d at 825. Appellees contend that Anthoine has not carried his burden at the third step of showing that his statements to Freeman were a substantial or motivating factor in any adverse employment action. But appellees do not directly address the related question, at the fifth step, of whether they have carried their own burden of showing that his statements were not a but-for cause of the adverse actions. As we have already discussed, Anthoine has provided evidence from which a jury could conclude that his protected speech was a motivating factor in the adverse actions. In light of the absence of conclusive evidence that Anthoine's unprotected behavior was the but-for cause of the adverse actions, that question cannot be resolved on summary judgment.

### 6.  Summary

**[13]** We therefore reverse and remand for further proceedings on Anthoine's First Amendment claim of retaliation for his statements to Freeman.

## B.    Gender Discrimination Claim

**[14]** Anthoine also brings a § 1983 claim for gender-based employment discrimination under the Equal Protection Clause of the Fourteenth Amendment. Although we are not bound by the "formal Title VII disparate treatment burden shifting framework when trying § 1983 claims," we agree with the parties that it is appropriate to apply the *McDonnell Douglas* burden-shifting framework to Anthoine's claim. *See Keyser*, 265 F.3d at 754; *see also Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576-77 (6th Cir. 2004). To establish a prima facie case under *McDonnell Douglas*, a plaintiff must demonstrate that: (1) he belonged to a protected class; (2) he was qualified for his job; (3) he was subjected to an adverse employment action; and (4) similarly situated employees not in his protected class received more favorable treatment. *Moran v. Selig*, 447 F.3d 748, 753 (9th Cir. 2006); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

**[15]** If Anthoine makes out a prima facie case, the burden shifts to defendants to provide non-discriminatory reasons for the adverse action. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). If they do so, the prima facie case "drops out of the picture," and a court evaluates the evidence to determine whether a reasonable jury could conclude that defendants discriminated against Anthoine based on gender. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006). Defendants do not challenge Anthoine's prima facie case, and Anthoine does not dispute that Defendants have articulated non-discriminatory reasons for the adverse employment action.

Anthoine may defeat summary judgment by offering direct or circumstantial evidence "that a discriminatory reason more likely motivated the employer," or "that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable." *Chuang*

*v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1127 (9th Cir. 2000); *see Cornwell*, 439 F.3d at 1028-29. "These two approaches are not exclusive; a combination of the two kinds of evidence may in some cases serve to establish pretext so as to make summary judgment improper." *Chuang*, 225 F.3d at 1127. However, "[a] plaintiff may not defeat a defendant's motion for summary judgment merely by denying the credibility of the defendant's proffered reason for the challenged employment action." *Cornwell*, 439 F.3d at 1028 n.6. When the evidence on which a plaintiff relies is circumstantial, "that evidence must be specific and substantial to defeat the employer's motion for summary judgment." *See EEOC v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009); *see Cornwell*, 439 F.3d at 1029.

Anthoine seeks to show discriminatory motive by arguing that Brown fired the only three males employed by NCCC on the same day, and that Brown used different tones of voice and "nonverbal" behaviors when speaking with male and female employees. Evidence that an employer terminated all three of its male employees on the same day could show gender-based animus. In this case, however, Anthoine has not offered any specific evidence about the circumstances in which the other men were terminated. Anthoine also contests the reasons for his reprimand and termination. Even taking his evidence as true, however, Anthoine has failed to carry his burden of showing his employer's explanation was unworthy of credence.

**[16]** Assessing in combination Anthoine's evidence challenging the employer's proffered explanation and his evidence ostensibly setting forth discriminatory motive, as *Chuang* requires, Anthoine has not carried his burden. The evidence Anthoine has set forth is not "specific and substantial" and does not create a triable issue of fact as to ultimate issue of gender-based discrimination.

### C.    Wrongful Discharge Claim

**[17]**  Finally, Anthoine asserts a state-law claim for wrongful termination in violation of public policy. In *Miklosy v. Regents of University of California*, 188 P.3d 629, 643-44 (Cal. 2008), the California Supreme Court held that a state common law claim for wrongful termination in violation of public policy, known as a *Tameny* action, cannot be brought against a public entity. According to the Court, § 815 of the California Government Claims Act abolished common law tort liability for public entities. *Id.* at 643; *see* Cal. Gov. Code § 815 ("Except as otherwise provided by statute . . . [a] public entity is not liable for an injury . . . ."). As a public entity, NCCC may not be held liable for such a claim. Nor may a wrongful discharge claim be brought against individual defendants such as Brown and Newton. As *Miklosy* explains,

> [A] *Tameny* action for wrongful discharge can only be asserted against *an employer*. An individual who is not an employer cannot commit the tort of wrongful discharge in violation of public policy; rather, he or she can only be the agent by which *an employer* commits that tort.

*Miklosy*, 188 P.3d at 644 (emphasis in original).

**[18]**  Because Anthoine may not bring a wrongful termination claim against NCCC, Brown, or Newton, we affirm the district court's grant of summary judgment on this claim.

### Conclusion

We hold that Anthoine has presented a triable issue of material fact on his First Amendment retaliation claim but has failed to do so on his gender discrimination and wrongful discharge claims. We reverse and remand the grant of summary judgment on Anthoine's First Amendment claim of retaliation for his statements to Freeman. We affirm the grant of sum-

mary judgment on his other claims. Each side is to bear its own costs on appeal.

**AFFIRMED IN PART; REVERSED and REMANDED IN PART.**