**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DAVID K. DEMERS,
*Plaintiff-Appellant*,

v.

ERICA AUSTIN; ERICH LEAR;
WARWICK M. BAYLY; FRANCES
MCSWEENEY,
*Defendants-Appellees*.

No. 11-35558

D.C. No.
2:09-cv-00334-
RHW

ORDER AND
OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Robert H. Whaley, Senior District Judge, Presiding

Argued and Submitted
November 7, 2012—Seattle, Washington

Filed January 29, 2014

Before: William A. Fletcher and Raymond C. Fisher,
Circuit Judges, and Gordon J. Quist, Senior District Judge.*

Order;
Opinion by Judge W. Fletcher

---

* The Honorable Gordon J. Quist, Senior United States District Judge for the Western District of Michigan, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel replaced its prior opinion, filed on September 4, 2013, and published at 729 F.3d 1011, with a new opinion, denied a petition for panel rehearing, and denied a petition for rehearing en banc on behalf of the court, in an action brought pursuant to 42 U.S.C. § 1983 by a tenured associate university professor who alleged that university administrators retaliated against him in violation of the First Amendment for distributing a short pamphlet and drafts from an in-progress book.

The panel held that *Garcetti v. Ceballos*, 547 U.S. 410 (2006), does not apply to speech related to scholarship or teaching. Rather, such speech is governed by *Pickering v. Board of Education*, 391 U.S. 563 (1968). The panel concluded that the short pamphlet was related to scholarship or teaching and that it addressed a matter of public concern under *Pickering*. The panel concluded, further, that there was insufficient evidence in the record to show that the in-progress book triggered retaliation against plaintiff. Finally, the panel concluded that defendants were entitled to qualified immunity from damages, given the uncertain state of the law in the wake of *Garcetti*.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Judith A. Endejan (argued), Graham & Dunn, PC, Seattle, Washington, for Plaintiff-Appellant.

Kathryn M. Battuello (argued) and Catherine Hendricks, Office of the Washington Attorney General, Seattle, Washington, for Defendants-Appellees.

John Joshua Wheeler, Thomas Jefferson Center, Charlottesville, Virginia, for Amici Curiae American Association of University Professors and the Thomas Jefferson Center for the Protection of Free Expression.

## ORDER

The opinion filed on September 4, 2013, and published at 729 F.3d 1011, is withdrawn and replaced by the attached opinion.

With the filing of this new opinion, the panel has voted to deny the petition for rehearing. Judge W. Fletcher has voted to deny the petition for rehearing en banc; and Judges Fisher and Quist so recommend.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing and the petition for rehearing en banc, filed October 3, 2013, are **DENIED**.

## OPINION

W. FLETCHER, Circuit Judge:

David Demers is a tenured associate professor at Washington State University. He brought suit alleging that university administrators retaliated against him in violation of the First Amendment for distributing a short pamphlet and drafts from an in-progress book. The district court granted summary judgment for the defendants, finding that the pamphlet and draft were distributed pursuant to Demers's employment duties under *Garcetti v. Ceballos*, 547 U.S. 410 (2006). Alternatively, the court held that the pamphlet was not protected under the First Amendment because its content did not address a matter of public concern.

We hold that *Garcetti* does not apply to "speech related to scholarship or teaching." *Id.* at 425. Rather, such speech is governed by *Pickering v. Board of Education*, 391 U.S. 563 (1968). In Demers's case, we conclude that the short pamphlet was related to scholarship or teaching, and that it addressed a matter of public concern under *Pickering.* We remand for further proceedings. We conclude, further, that there is insufficient evidence in the record to show that the in-progress book triggered retaliation against Demers. Finally, we conclude that defendants are entitled to qualified immunity, given the uncertain state of the law in the wake of *Garcetti*.

## I.  Background

David Demers is a member of the faculty in the Edward R. Murrow College of Communication ("Murrow School" or "Murrow College") at Washington State University

("WSU"). He joined the faculty in 1996. He was granted tenure as an associate professor in 1999. Demers also owns and operates Marquette Books, an independent publishing company.

Demers brought suit alleging First Amendment violations by WSU Interim Director of the Murrow School Erica Austin, Vice Provost for Faculty Affairs Frances McSweeney, Dean of the College of Liberal Arts Erich Lear, and Interim WSU Provost and Executive Vice President Warwick Bayly. Demers contends that defendants retaliated against him, in violation of his First Amendment rights, for distributing a pamphlet called "The 7-Step Plan" ("the Plan") and for distributing a draft introduction and draft chapters of an in-progress book titled "*The Ivory Tower of Babel*" ("*Ivory Tower*"). Demers contends that defendants retaliated by giving him negative annual performance reviews that contained falsehoods, by conducting two internal audits, and by entering a formal notice of discipline. Demers contends in his brief that over a three-year period he "went from being a popular teacher and scholar with high evaluations to a target for termination" due to the actions of defendants.

The Plan is a two-page pamphlet Demers wrote in late 2006 and distributed in early 2007. Demers distributed the Plan while he was serving on the Murrow School's "Structure Committee," which was actively debating some of the issues addressed by the Plan. At that time, the Murrow School was part of the College of Liberal Arts at WSU, but the faculty had voted unanimously in favor of becoming a free-standing College. (It became a College in July 2008.) The Murrow School had two faculties. One faculty was Mass Communications, which had a professional and practical orientation. The other was Communications Studies, which

had a more traditional academic orientation. Faculty members held appointments in either Mass Communications or Communications Studies. The Structure Committee was considering whether to recommend, as part of the restructuring of the Murrow School, that the two faculties of the School be separated. There was serious disagreement at the Murrow School on that question.

Demers is a member of the Mass Communications faculty. Demers's Plan proposed separating the two faculties. It proposed strengthening the Mass Communications faculty by appointing a director with a strong professional background and giving more prominent roles to faculty members with professional backgrounds. For four years, early in his career, Demers had himself been a professional reporter.

On January 16, 2007, Demers sent the Plan to the Provost of WSU. In his cover letter, he stated that the purpose of the Plan is to show how WSU "can turn the Edward R. Murrow School of Communication into a revenue-generating center for the university and, at the same time, improve the quality of the program itself." Demers's letter also stated, "To initiate a fund-raising campaign to achieve this goal, my company and I would like to donate $50,000 in unrestricted funds to the university." Demers signed the letter "Dr. David Demers, Publisher/ Marquette Books LLC." A footnote appended to the signature line specified, "Demers also is associate professor of communications at Washington State University. Marquette Books LLC is a book/journal publishing company that he operates in his spare time. It has no ties with nor does it use any of the resources at Washington State University." The cover of the Plan states that it was "prepared by Marquette Books LLC." The Provost did not respond to

Demers's letter and Plan. On March 29, 2007, Demers sent the Plan to the President of WSU. The cover letter was identical to the letter he had sent to the Provost, except that he increased the offered donation to $100,000.

In his declaration, Demers states that he sent the Plan "to members of the print and broadcast media in Washington state, to administrators at WSU, to some of my colleagues, to the Murrow Professional Advisory Board, and others." Demers also posted the Plan on the Marquette Books website. In his deposition, Demers stated that he could not remember the names of the individuals to whom he had sent the Plan. Demers did not submit the Plan to the Structure Committee or to Interim Director Austin. In her deposition, Austin stated that alumni and members of the professional community contacted faculty members to ask about the Plan.

During the period relevant to his suit, Demers had completed drafts of parts of what would eventually become "*Ivory Tower*." The book was not published until after the actions about which Demers complains took place. In his self-prepared 2006 "Faculty Annual Report," submitted in early 2007, Demers described the in-progress book as "partly autobiographical and partly empirical. It will involve national probability surveys of social scientists, governmental officials and journalists." Demers attached a copy of the draft introduction and the first chapter to his November 2007 application for a sabbatical. In his application, he described the planned book as follows:

> [T]he book examines the role and function of social science research in society. . . . Today most social scientists believe very strongly that the research they conduct is important for

> solving social problems, or at least has some
> impact on public policy.  However, empirical
> research in political science and public policy
> shows just the opposite.  Social scientific
> research generally has little impact on public
> policy decisions and almost never has a direct
> impact on solving social problems.  Instead,
> social movements play a much more
> important role . . . .

Demers also wrote in the application, "The book contains information that is critical of the academy, including some events at Washington State University."  In his self-prepared 2008 Annual Activity Report, Demers reported that he had completed 250 of a planned 380 pages of the book.

Demers did not put any of the drafts of the book in the record.  Interim Director Austin recalled in her deposition that she had seen parts of the book in connection with Demers's application for sabbatical.  Vice Provost McSweeney stated in her deposition that she read some draft chapters that had been posted online, in particular chapters written about her and about "anything that [she] was directly involved in."

Demers contends that defendants retaliated against him for circulating the Plan and drafts of *Ivory Tower*.  He claims that Austin and others knowingly used incorrect information to lower his performance review scores for 2006, 2007, and 2008.  He contends that some defendants falsely stated that he had improperly canceled classes and that he had not gone through the proper university approval process before starting Marquette Books.  He contends that specific acts of retaliation included spying on his classes, preventing him

from serving on certain committees, preventing him from teaching basic Communications courses, instigating two internal audits, sending him an official disciplinary warning, and excluding him from heading the journalism sequence at the Murrow School. Demers claims that these acts affected his compensation and his reputation as an academic. Demers argues on appeal that the Plan is protected, despite *Garcetti*, because it was not written and distributed as part of his employment. He contends further that the Plan and *Ivory Tower* are protected because *Garcetti* does not apply to academic speech.

Defendants respond that changes in Demers's evaluations and the investigations by the university were warranted, and were not retaliation for the Plan or *Ivory Tower*. Defendants contend that Demers reoriented his priorities away from academia after receiving tenure, that Demers's attendance at faculty committee meetings was sporadic, and that Demers gave online quizzes instead of appearing in person to teach his Friday classes despite repeated requests to comply with university policies that required him to appear in person. Defendants contend that the legitimate reasons for Demers's critical annual reviews include his post-tenure failure to publish scholarship in refereed journals, his failure to perform his appropriate share of university service, and his failure to report properly his activities at Marquette Books. Defendants contend, further, that Demers's lower marks under Interim Director Austin were partly attributable to an overall adjustment of the annual review scale for the faculty as a whole.

Defendants contend that the Plan was written and circulated pursuant to Demers's official duties and so is not protected under *Garcetti*, and that, in any event, the Plan does

not address a matter of public concern. They contend that because Demers failed to place any of the drafts of *Ivory Tower* in the record, there is insufficient evidence upon which to sustain Demers's retaliation claim based on those drafts. Finally, defendants contend that they are entitled to qualified immunity from any damages based on the uncertain status of teaching and academic writing after *Garcetti*.

The district court granted summary judgment to defendants. It held that the Plan and *Ivory Tower* were written and distributed in the performance of Demers's official duties as a faculty member of WSU, and were therefore not protected under the First Amendment. The district court held, alternatively, with respect to the Plan, that it did not address a matter of public concern. Demers timely appealed.

## II. Standard of Review

We review a district court's grant of summary judgment *de novo*. *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Because this appeal is taken from an order of summary judgment in favor of defendants, "'[t]he evidence of [Demers] is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Garcetti v. Ceballos*, 547 U.S. 410, 442 n.13 (2006) (first alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

### III.  Discussion

Demers makes two arguments.  First, he argues that writing and distributing the Plan were not done pursuant to his official duties, and thus do not come within the Court's holding in *Garcetti*.  Second, he argues that even if he wrote and distributed the Plan (as well as *Ivory Tower*) pursuant to his official duties, *Garcetti*'s holding does not extend to speech and academic writing by a publicly employed teacher. We disagree with his first argument but agree with his second.

### A. Speech Pursuant to Official Duties

The district court found that Demers wrote and distributed the Plan and *Ivory Tower* pursuant to his duties as a professor at WSU.  We agree with the district court.  "[A]fter *Garcetti*, . . . the question of the scope and content of a plaintiff's job responsibilities is a question of fact." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1072 (9th Cir. 2013) (en banc) (citation and internal quotation marks omitted).

While he was preparing the Plan, Demers sent an email to his fellow faculty members at the Murrow School, soliciting ideas and comments.  He wrote:

> As you know, I'm preparing a proposal for splitting the School back into two separate units, a Communications Studies department and a professional/mass communication school.

In his self-prepared 2007 Annual Activity Report, Demers listed under the heading "Murrow School of Communication Service Activities":

> Developed a 7-Step Plan for reorganizing the Murrow School to improve the quality of the professional programs and attract more development funds. The plan recommends that the communications studies program be separated from the four professional programs (print journalism, broadcasting, public relations, and advertising), the School hire more professionals and give them more authority, seek accreditation for the professional programs, and develop stronger partnerships with the business community.

Demers prepared and sent the Plan to the Provost and President while he was serving as a member of the Murrow School "Structure Committee," which was deciding, among other things, whether to recommend separating the Mass Communications and Communications Studies faculties.

Demers points out that the cover of the Plan indicates that it was prepared by Marquette Books, that he did not sign his cover letters to the Provost and the President as a professor, and that he included a footnote in the letter stating that he was not acting as a professor. He contends that this, along with his private donation offer, shows that he was not acting pursuant to his duties as a professor when he wrote and distributed the Plan. However, it is impossible, as a real-world practical matter, to separate Demers's position as a member of the Mass Communications faculty, and as a member of the Structure Committee, from his preparation and

distribution of his Plan. Further, we note that when it was to his advantage to do so, Demers characterized his development of the Plan as part of his official duties in his 2007 Annual Activities Report. Demers may not have been acting as a team player in sending his Plan directly to the top administrators at WSU, rather than working with and through his fellow committee members. But we conclude that in preparing the Plan, in sending the Plan to the Provost and President, in posting the Plan on the Internet, and in distributing the Plan to news media, to selected faculty members and to alumni, Demers was acting sufficiently in his capacity as a professor at WSU that he was acting "pursuant to [his] official duties" within the meaning of *Garcetti*. 547 U.S. at 421. We thus turn to the question whether *Garcetti* applies to academic speech.

## B. Academic Speech Under the First Amendment

Until the Supreme Court's 2006 decision in *Garcetti*, public employees' First Amendment claims were governed by the public concern analysis and balancing test set out in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Connick v. Myers*, 461 U.S. 138 (1983). *Garcetti*, however, changed the law. The plaintiff in *Garcetti* was a deputy district attorney who had written a memorandum concluding that a police affidavit supporting a search warrant application contained serious misrepresentations. *Garcetti*, 547 U.S. at 413–14. The plaintiff contended that his employer retaliated against him in violation of the First Amendment for having written and then defended the memorandum. *Id*. at 415. The Court held in *Garcetti* that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and

the Constitution does not insulate their communications from employer discipline." *Id*. at 421.

However, *Garcetti* left open the possibility of an exception. In response to a concern expressed by Justice Souter in dissent, the Court reserved the question whether its holding applied to "speech related to scholarship or teaching." *Id.* at 425. Justice Souter had expressed concern about the potential breadth of the Court's rationale, writing, "I have to hope that today's majority does not mean to imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write 'pursuant to . . . official duties.'" *Id.* at 438 (Souter, J., dissenting) (alteration in original).

Demers presents the kind of case that worried Justice Souter. Under *Garcetti*, statements made by public employees "pursuant to their official duties" are not protected by the First Amendment. 547 U.S. at 421. But teaching and academic writing are at the core of the official duties of teachers and professors. Such teaching and writing are "a special concern of the First Amendment." *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967). We conclude that if applied to teaching and academic writing, *Garcetti* would directly conflict with the important First Amendment values previously articulated by the Supreme Court. One of our sister circuits agrees. *See Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 562 (4th Cir. 2011) ("We are . . . persuaded that *Garcetti* would not apply in the academic context of a public university as represented by the facts of this case.").

The Supreme Court has repeatedly stressed the importance of protecting academic freedom under the First Amendment. It wrote in *Keyishian*:

> Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."

*Id.* at 603 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). It had previously written to the same effect in *Sweezy v. New Hampshire*:

> The essentiality of freedom in the community of American universities is almost self-evident. . . . To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. . . . Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

354 U.S. 234, 250 (1957). More recently, the Court wrote in *Grutter v. Bollinger*, "We have long recognized that, given

the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." 539 U.S. 306, 329 (2003); *see also Rust v. Sullivan*, 500 U.S. 173, 200 (1991) ("[T]he university is . . . so fundamental to the functioning of our society that the Government's ability to control speech within that sphere by means of conditions attached to the expenditure of Government funds is restricted by the vagueness and overbreadth doctrines of the First Amendment.").

We conclude that *Garcetti* does not — indeed, consistent with the First Amendment, cannot — apply to teaching and academic writing that are performed "pursuant to the official duties" of a teacher and professor. We hold that academic employee speech not covered by *Garcetti* is protected under the First Amendment, using the analysis established in *Pickering*. The *Pickering* test has two parts. First, the employee must show that his or her speech addressed "matters of public concern." *Pickering*, 391 U.S. at 568; *see Connick*, 461 U.S. at 146. Second, the employee's interest "in commenting upon matters of public concern" must outweigh "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568; *see Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001); *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000).

In *Pickering*, a public high school teacher wrote a letter to a local newspaper complaining about budgetary decisions made by the school district. *Pickering*, 391 U.S. at 564. The Court wrote that teachers have a First Amendment right "to comment on matters of public interest in connection with the

operation of the public schools in which they work," but that, at the same time, the rights of public school teachers are not independent of the interest of their employing school district. *Id*. at 568. The task of a court is "to arrive at a balance between the interests of the teacher, as a citizen, . . . and the interest of the State, as an employer." *Id*. The Court held in *Pickering* that "the question whether a school system requires additional funds is a matter of legitimate public concern," *id.* at 571, and that the school district did not have a sufficient interest in preventing the teacher from speaking out on this question to deprive him of his First Amendment rights. *Id.* at 572–74.

In *Connick v. Myers*, the Court returned to the question whether an employee's speech addressed a matter of public concern. The employee in *Connick* was an assistant district attorney who objected to being transferred to prosecute cases in a different section of the criminal court. 461 U.S. at 140. She circulated a questionnaire within the district attorney's office raising questions about "office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Id.* at 141. The Court held that all but one of the topics in the questionnaire were not matters of public concern. With the exception of the question about pressure to work on political campaigns, the "questions reflect[ed] one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause célèbre." *Id.* at 148. The Court held that the question about political campaigns, however, addressed "a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." *Id.* at 149.

The Court in *Connick* refined the *Pickering* analysis in two ways.  First, perhaps recognizing the artificiality of characterizing an employee's speech about matters relating to his employment as merely speech "as a citizen," the Court did not insist on characterizing the *Connick* plaintiff's protected question about political campaigns as speech "as a citizen." While her question may in some sense have been speech as a citizen, it was much more directly and obviously speech as an employee.  Not only did the employee circulate her questionnaire exclusively within her workplace.  In addition, the clear implication from the record is that she was herself subject to pressure to work on campaigns, and that her fellow employees, to whom she sent the questionnaire, were subject to that same pressure.  Second, the Court emphasized the subtlety of the balancing process, writing that "the State's burden in justifying a particular [discipline] varies depending upon the nature of the employee's expression.  Although such particularized balancing is difficult, the courts must reach the most appropriate possible balance of the competing interests."  *Id.* at 150.

The *Pickering* balancing process in cases involving academic speech is likely to be particularly subtle and "difficult."  *Id.*  The nature and strength of the public interest in academic speech will often be difficult to assess.  For example, a long-running debate in university English departments concerns the literary "canon" that should have pride of place in the department's curriculum.  This debate may seem trivial to some.  But those who conclude that the composition of the canon is a relatively trivial matter do not take into account the importance to our culture not only of the study of literature, but also of the choice of the literature to be studied.  Analogous examples could readily be drawn from philosophy, history, biology, physics, or other disciplines.

Recognizing our limitations as judges, we should hesitate before concluding that academic disagreements about what may appear to be esoteric topics are mere squabbles over jobs, turf, or ego.

The nature and strength of the interest of an employing academic institution will also be difficult to assess. Possible variations are almost infinite. For example, the nature of classroom discipline, and the part played by the teacher or professor in maintaining discipline, will be different depending on whether the school in question is a public high school or a university, or on whether the school in question does or does not have a history of discipline problems. Further, the degree of freedom an instructor should have in choosing what and how to teach will vary depending on whether the instructor is a high school teacher or a university professor. Still further, the evaluation of a professor's writing for purposes of tenure or promotion involves a judgment by the employing university about the quality of what he or she has written. Ordinarily, such a content-based judgment is anathema to the First Amendment. But in the academic world, such a judgment is both necessary and appropriate. Here too, recognizing our limitations, we should hesitate before concluding that we know better than the institution itself the nature and strength of its legitimate interests.

With the foregoing in mind, we turn to what Demers wrote.

## C.  *Ivory Tower*

We put to one side Demers's *Ivory Tower*. For reasons best known to himself, Demers did not put the draft introduction or any of the draft chapters of *Ivory Tower* into

the record. The only information we have about those drafts are the brief descriptions Demers provided when he applied for sabbatical and when he described his academic activities for purposes of his annual reviews, and the acknowledgments by Austin and McSweeney that they saw or read parts of those drafts. There is only one sentence in Demers's descriptions of his drafts that could conceivably have prompted any adverse reaction from defendants. In his application for sabbatical, Demers wrote, "The book contains information that is critical of the academy, including some events at Washington State University." However, Demers described no specific "events" at WSU. This is pretty thin gruel. Even assuming for the moment that defendants retaliated against Demers, he has provided insufficient information about the drafts of *Ivory Tower* to support a claim that any such retaliation resulted from those drafts. We therefore conclude that Demers has failed to establish a First Amendment violation with respect to *Ivory Tower*.

### D.  The Plan

#### 1.  "Speech Related to Scholarship or Teaching" Under *Garcetti*

We conclude that The 7-Step Plan prepared by Demers in connection with his official duties as a faculty member of the Murrow School was "related to scholarship or teaching" within the meaning of *Garcetti*. *See* 547 U.S. at 425. The basic thrust of the Plan may be understood from its first paragraphs:

> The relationship between mass communication programs (e.g., journalism, broadcasting, public relations, advertising)

and the academy in general has always been a rocky one. The first print journalism programs emerged in the early 1900s, mostly at Midwestern universities and colleges, and were staffed largely with teachers who had professional backgrounds (former journalists and editors). As the years passed, increasing pressure was placed on journalism and other related programs (broadcasting, public relations, advertising) to "scholarize" their faculty — that is, to hire faculty who had earned Ph.D. degrees in the social sciences and conduct research. At the same time, the programs began hiring fewer teachers with professional experience.

As the number of Ph.D.s increased, so did the tension within these departments. Some historians have referred to this as the era of the "green eyeshades" versus the "chi-squares." Not unexpectedly, at larger research-oriented universities, the Ph.D.s won the battle and today most of the faculty teaching in mass communication programs at research-oriented universities have the Ph.D.

Needless to say, this turn of events alienated many professionals and media-related businesses. Students were required to take more theory and conceptual courses and fewer skills-based courses, such as writing and reporting. Professionals complained more and more that the writing skills of university graduates were declining. The close

relationship universities once had with the professional community was disappearing.

The Plan proposed seven steps that would increase the influence of professionals and reduce the influence of Ph.Ds within the Murrow School. Those steps were:

> 1. Separate the mass communication program from the communication studies program at WSU — i.e., create two separate units. . . .
>
> 2. Hire a director of the Edward R. Murrow School of Communication who has a strong professional background. . . .
>
> 3. Create an Edward R. Murrow Center for Media Research that conducts joint research projects with the professional community. . . .
>
> 4. Give professionals an active (rather than the current passive) role in the development of the curriculum in the School. . . .
>
> 5. Give professional faculty a more active role in the development of the undergraduate curriculum for mass communication students. . . .
>
> 6. Seek national accreditation for the "new" mass communication program. . . .
>
> 7. Hire more professional faculty with substantial work experience. . . .

In Demers's view, the teaching of mass communications had lost a critical connection to the real world of professional communicators. His Plan, if implemented, would restore that connection and would, in his view, greatly improve the education of mass communications students at the Murrow School. It may in some cases be difficult to distinguish between what qualifies as speech "related to scholarship or teaching" within the meaning of *Garcetti*. But this is not such a case. The 7-Step Plan was not a proposal to allocate one additional teaching credit for teaching a large class instead of a seminar, to adopt a dress code that would require male teachers to wear neckties, or to provide a wider range of choices in the student cafeteria. Instead, it was a proposal to implement a change at the Murrow School that, if implemented, would have substantially altered the nature of what was taught at the school, as well as the composition of the faculty that would teach it.

### 2. Matter of Public Concern Under *Pickering*

The first step in determining whether the Plan is protected under the First Amendment is to determine whether it addressed a matter of public concern. Whether speech is a matter of public concern under *Pickering* is a matter of law that we review de novo. *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 648 (9th Cir. 2006). The plaintiff bears the burden of showing that his or her speech addresses an issue of public concern. *Eng v. Cooley*, 552 F.3d 1062, 1071 (9th Cir. 2009).

"Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" *Johnson v. Multnomah Cnty.*, 48 F.3d 420, 422 (9th Cir. 1995) (quoting

*Connick*, 461 U.S. at 146). The "essential question is whether the speech addressed matters of public as opposed to personal interest." *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009) (internal quotation marks and citation omitted). Public interest is "defined broadly." *Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 978 (9th Cir. 2002). We have adopted a "liberal construction of what an issue of public concern is under the First Amendment." *Roe v. City & Cnty. of S.F.*, 109 F.3d 578, 586 (9th Cir. 1997) (internal quotation marks omitted). We consider "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48. Of these, content is the most important factor. *Desrochers*, 572 F.3d at 710.

We begin by noting two obvious points. First, not all speech by a teacher or professor addresses a matter of public concern. Teachers and professors, like other public employees, speak and write on purely private matters. If a publicly employed professor speaks or writes about what is "properly viewed as essentially a private grievance," *Roe*, 109 F.3d at 585, the First Amendment does not protect him or her from any adverse reaction. Second, protected academic writing is not confined to scholarship. Much academic writing is, of course, scholarship. But academics, in the course of their academic duties, also write memoranda, reports, and other documents addressed to such things as a budget, curriculum, departmental structure, and faculty hiring. Depending on its scope and character, such writing may well address matters of public concern under *Pickering*. Indeed, in *Pickering* itself the teacher's protected letter to the newspaper addressed operational and budgetary concerns of the school district. The Court in *Pickering* noted that the letter addressed "the preferable manner of operating the school system," which "clearly concerns an issue of general

public interest." 391 U.S. at 571. Further, the Court wrote that "the question whether a school system requires additional funds is a matter of legitimate public concern." *Id*.

Demers described his Plan on its cover as a "7-Step Plan for Making the Edward R. Murrow School of Communication Financially Independent." The first page of the Plan gave an abbreviated history of "mass communications programs . . . and the academy in general," and placed the communications program at WSU in the broader context of similar programs at other universities. The second page recommended seven steps for improving the communications program at WSU. Demers's Plan did not focus on a personnel issue or internal dispute of no interest to anyone outside a narrow "bureaucratic niche." *Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996) (citation omitted); *see Desrochers*, 572 F.3d at 713. Nor did the Plan address the role of particular individuals in the Murrow School, or voice personal complaints. Rather, the Plan made broad proposals to change the direction and focus of the School. *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1263 (10th Cir. 2005) (holding that a professor's critiques of a plan to move the medical school "addressing the use of public funds and regarding the objectives, purposes and mission of the University of Colorado and its medical school fall well within the rubric of 'matters of public concern'"). The importance of the proposed steps in Demers's Plan is suggested by the fact that the Murrow School had appointed a "Structure Committee," of which Demers was a member, to address some of the very issues addressed in Demers's Plan.

The manner in which the Plan was distributed reinforces the conclusion that it addressed matters of public concern. If an employee expresses a grievance to a limited audience,

such circulation can suggest a lack of public concern. *See Desrochers*, 572 F.3d at 713–14. But limited circulation is not, in itself, determinative, as may be seen in *Connick* where the questionnaire was distributed only within the employee's office. *See* 461 U.S. at 141. Here, Demers sent the Plan to the President and Provost of WSU, to members of the Murrow School's Professional Advisory Board, to other faculty members, to alumni, to friends, and to newspapers. He posted the Plan on his website, making it available to the public.

There may be some instances in which speech about academic organization and governance does not address matters of public concern. *See, e.g.*, *Brooks v. Univ. of Wis. Bd. of Regents*, 406 F.3d 476, 480 (7th Cir. 2005) (objections by professors against the closing of their laboratories and study programs represented "a classic personnel struggle — infighting for control of a department — which is not a matter of public concern"); *Clinger v. N.M. Highlands Univ., Bd. of Regents*, 215 F.3d 1162, 1166 (10th Cir. 2000) (no matter of public concern where professor publicly disagreed with the Board of Trustees "on the internal process they followed in selecting a president and reorganizing the University"). But this is not such a case. Demers's Plan contained serious suggestions about the future course of an important department of WSU, at a time when the Murrow School itself was debating some of those very suggestions. We therefore conclude that the Plan addressed a matter of public concern within the meaning of *Pickering*.

### E. Remaining Issues on the Merits

Based on its holding that Demers's Plan did not address a matter of public concern, the district court granted summary

judgment to defendants. As to the three questions it would have had to reach had it held otherwise, the district court wrote that there were questions of material fact. Those questions were whether defendants had a sufficient interest in controlling or sanctioning Demers's circulation of the Plan to deprive it of First Amendment protection; whether, if the Plan was protected speech under the First Amendment, its circulation was a substantial or motivating factor in any adverse employment action defendants might have taken; and whether defendants would have taken such employment action absent the protected speech. *See Anthoine v. N. Cent. Cntys. Consortium*, 605 F.3d 740, 748 (9th Cir. 2010). The district court may address those questions, as appropriate, on remand.

## F. Qualified Immunity and Prospective Relief

Defendants are entitled to qualified immunity, even if they violated Demers's First Amendment rights, if they reasonably could have believed that their conduct was lawful "in light of clearly established law and the information [that they] possessed." *Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968, 973 (9th Cir. 1996) (alteration in original) (quoting *Baker v. Racansky*, 887 F.2d 183, 187 (9th Cir. 1989)). A right is clearly established when the contours of the right are "'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1073 (9th Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)).

Until the decision in this case, our circuit has not addressed the application of *Garcetti* to teaching and academic writing. In *Adams*, after the Fourth Circuit held

that *Garcetti* did not apply, it considered whether defendants had qualified immunity in light of "the uncertain state of the law in the area of what protection should be afforded to public university teacher's speech following *Garcetti*." *Adams*, 640 F.3d at 565. The court held that the professor's First Amendment rights were clearly established in the Fourth Circuit, and it denied qualified immunity. *Id*. at 565–66; *see also Karl*, 678 F.3d at 1074 (denying qualified immunity in a *Garcetti* case in light of clear in-circuit precedent). However, because there is no Ninth Circuit law on point to inform defendants about whether or how *Garcetti* might apply to a professor's academic speech, we cannot say that the contours of the right in this circuit were "sufficiently clear that every reasonable official would have understood" that this conduct violated that right. *Id.* at 1073 (internal quotation marks omitted). We therefore hold that defendants are entitled to qualified immunity.

Qualified immunity of course does not preclude injunctive relief. Should the district court determine that Demers's First Amendment rights were violated, it may still grant injunctive relief to the degree it is appropriate. *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 527 (9th Cir. 1989) ("Qualified immunity is an affirmative defense to damage liability; it does not bar actions for declaratory or injunctive relief." (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982))).

## Conclusion

We hold that there is an exception to *Garcetti* for teaching and academic writing. We affirm the district court's determination that Demers prepared and circulated his Plan pursuant to official duties, but we reverse its determination

that the Plan does not address matters of public concern.  We hold that defendants are entitled to qualified immunity.  We remand for further proceedings consistent with this opinion.

The parties shall bear their own costs.

**AFFIRMED in part, REVERSED in part, and REMANDED.**