Filed 11/3/25  Gensler v. Board of Trustees etc.  CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| HOWARD GENSLER,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>BOARD OF TRUSTEES OF THE SOUTH ORANGE COUNTY COMMUNITY COLLEGE DISTRICT et al.,<br><br>  Defendants and Respondents. | G064067<br><br>(Super. Ct. No. 30-2021-01177691)<br><br>O P I N I O N |

        Appeal from a judgment of the Superior Court of Orange County, Kimberly A. Knill, Judge. Affirmed.

        Howard Gensler, in pro. per., for Plaintiff and Appellant.

        Walsh & Associates, Dennis J. Walsh and Wendy K. Marcus for Defendants and Respondents.

Howard Gensler appeals from a judgment entered after the trial court denied his petition for writ of mandate. In 2019, the Board of Trustees of the South Orange County Community College District (Board) and the South Orange County Community College District (District) (collectively, respondents) terminated Gensler's employment as a tenured faculty member at Saddleback College. On appeal, Gensler challenges the termination decision, arguing: (1) respondents acted in excess of their jurisdiction when the District dismissed Gensler without conducting a performance evaluation; (2) the administrative law judge (ALJ) erred by finding Gensler was evidently unfit for service under Education Code section 87732, subdivision (d) (all undesignated statutory references are to this code), and the court did not conduct the required judicial review; (3) the ALJ erred by finding Gensler "'persistently violated, or refused to obey . . . reasonable regulations'" under section 87732, subdivision (f), and the court did not perform the required judicial review; (4) the District and the ALJ contravened Gensler's First Amendment rights and academic freedom, and the court failed to conduct the required judicial review; and (5) respondents' actions and the administrative proceedings were biased and unfair.[1]

We affirm. We conclude respondents substantially complied with the evaluation requirement in section 87671 and in the District's master agreement with the faculty association. We decline to address any arguments the ALJ erred because, on appeal, we review only the trial court's findings. (*Shenouda v. Veterinary Medical Bd.* (2018) 27 Cal.App.5th 500, 512.)

---

[1] For ease of reading, we have omitted some formatting (such as boldface, underlining, or capitalization) from quoted material found in the record and briefs.

We determine the court performed the proper judicial review of the ALJ's findings under section 87732, subdivisions (d) and (f). We also find Gensler fails to establish a First Amendment violation and to show how respondents or administrative proceedings were biased and unfair.

FACTUAL AND PROCEDURAL BACKGROUND

I.

EMPLOYMENT TERMINATION AND ADMINISTRATIVE PROCEEDINGS

Gensler started working for the District as a regular academic employee in January 2003, and was a faculty member at Saddleback College during the relevant time periods. He has undergraduate degrees from the University of California, Irvine, in five disciplines; a master of public policy and a juris doctor from the University of California, Berkeley; and a master of arts and doctor of philosophy in economics from the University of California, Irvine. He has been an academic for nearly his entire career. He has a California community college teaching credential in various subject matters, including economics, law, social science, public services and administration, and government.

*A. Employment Termination*

In December 2018, the District put Gensler on administrative leave and notified him of its intent to terminate his employment. In January 2019, Gensler attended a *Skelly* hearing, conducted by Dr. Elliot Stern, who had become president of Saddleback College only two days before.[2] After considering Gensler's evidence, Stern affirmed the termination decision.

On January 31, 2019, Stern signed the statement of charges and recommendation for termination. On the same day, Dr. Kathleen Burke, the

_____

[2] *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194.

3

District's chancellor, signed a concurrence. In February 2019, the District sent these documents, along with Gensler's latest performance evaluation covering the period between October 17, 2012, and November 2, 2015, to the Board.

In February 2019, the Board voted to give notice to Gensler the District would terminate his employment 30 days from the service of the notice unless he asked for a hearing. After receiving the notice, Gensler requested a hearing.

In June 2019, Stern filed a 25-page accusation with 42 exhibits in support, alleging two grounds for dismissal: (1) "[e]vident unfitness for service" (§ 87732, subd. (d)), and (2) "[p]ersistent violation of, or refusal to obey, the school laws of the state or reasonable regulations prescribed for the government of the community colleges by the board of governors or by the governing board of the community college district employing him or her" (§ 87732, subd. (f)). The accusation alleges multiple instances of misconduct. The Board certified the matter to the Office of Administrative Hearings for the appointment of an ALJ under section 87678.

*B. Administrative Hearing and Decision*

In February 2020, the ALJ held a 10-day hearing on the matter. The ALJ received testimonial and documentary evidence and the parties' arguments.

In October 2020, the ALJ issued a 137-page decision, affirming the District's decision to terminate Gensler's employment. The ALJ found, "Cause exists to dismiss [Gensler] pursuant to [s]ection 87732, subdivisions (d) and (f). The [D]istrict's decision to dismiss [Gensler] from employment is reasonable and supported by a preponderance of the evidence."

4

### 1. Section 87732, Subdivision (f)

The ALJ first discussed how Gensler persistently violated or refused to obey policies and regulations under section 87732, subdivision (f). The relevant policy and regulation were: board policy 4000.5 ("'Harassment and Discrimination Prevention and Complaints'") and administrative regulation 4000.5 ("'Harassment and Discrimination Prevention and Complaints Procedures'"). The ALJ explained board policy 4000.5 "reflects the [D]istrict's commitment 'to providing an academic and work environment that respects the dignity of individuals and groups.' The policy prohibits harassment and discrimination based on any legally protected characteristic, including 'race, color, ancestry, national origin, physical disability, mental disability, medical condition, marital status, sex, gender, or the perception that a person has one or more of the foregoing characteristics.' The policy applies to any aspect of the academic environment, including classroom conditions, grades, and participation in any community college activity. The policy requires the [c]hancellor to adopt regulations pursuant to the policy."

The ALJ explained administrative regulation 4000.5 "provides specific definitions and complaint procedures for harassment and discrimination. Like the board policy, the regulations prohibit harassment based on a protected characteristic. It provides additional guidance on gender-based harassment and states it 'does not necessarily involve conduct that is sexual. Any hostile or offensive conduct based on gender can constitute prohibited harassment.' [Citation.] Forms of prohibited harassment for all categories include, but are not limited to the following:

"1. Verbal: [¶] Inappropriate or offensive remarks, slurs, jokes or innuendoes based on a person's race, gender, sexual orientation, or other protected status. This may include, but is not limited to, inappropriate

5

comments regarding an individual's body, physical appearance, attire, sexual prowess, marital status, or sexual orientation; unwelcome flirting or propositions; demands for sexual favors; verbal abuse, threats or intimidation; or sexist, patronizing or ridiculing statements that convey derogatory attitudes based on gender, race, nationality, sexual orientation or other protected status. [¶] . . . [¶]

"4. Environmental: [¶] A hostile academic or work environment may exist where it is permeated by sexual innuendo; insults or abusive comments directed at an individual or group based on gender, race, nationality, sexual orientation or other protected status; or gratuitous comments regarding gender, race, sexual orientation, or other protected statuses that are not relevant to the subject matter of the class or activities on the job. A hostile environment can arise from: [¶] an unwarranted focus on sexual topics or sexually suggestive statements in the classroom or work environment; [¶] an unwarranted focus on, or stereotyping of particular racial or ethnic groups, sexual orientations, genders, or other protected statuses[.] An environment may be hostile toward anyone who merely witnesses unlawful harassment in their immediate surroundings, although the conduct is directed at others. The determination of whether an environment is hostile is based on the totality of the circumstances, including such factors as the frequency of the conduct, the severity of the conduct, whether the conduct is humiliating or physically threatening, and whether the conduct unreasonably interferes with an individual's learning or work activities."

Although the ALJ rejected certain allegations by the District, the ALJ found Gensler made the following comments during a Fall 2017 American Government class: "[Gensler] said that Iranian women dressed like

6

'hookers'; made comments about Middle Easterners hating Persians; and during a lecture on the Iran-Iraq war, said the United States sold weapons to Iraq because Iranians were 'jerks' and called Iranians evil." The ALJ determined: "[T]he [D]istrict established that the story about Iranian women dressing like prostitutes violated [board policy] 4000.5 and [administrative regulation] 4000.5. The reference to 'hookers' constituted 'inappropriate or offensive' remarks based on gender and national origin."

The ALJ also found Gensler made the following comments during a Spring 2018 American Government class: "[Gensler] told a story about a former student in which he described her scant attire and breast size; repeatedly used the word 'tard' to describe himself and students; referred to wives as 'bitches'; wore a jacket containing Playboy insignias to class; and made a crude reference to Ariana Huffington performing oral sex in order to achieve political recognition." The ALJ concluded: "These comments cumulatively constituted hostile or offensive conduct in violation of [board policy] 4000.5 and [administrative regulation] 4000.5, as inappropriate or offensive remarks, jokes or innuendoes based on a person's gender or other protected status. They also constituted inappropriate comments regarding an individual's body, physical appearance, attire, and/or[] were patronizing or ridiculing statements that conveyed derogatory attitudes based on a protected status. The gratuitous comments created a hostile academic environment that interfered with the learning or work activities of several students."

After finding the violation of board policy 4000.5 and administrative regulation 4000.5 evidenced "unfitness to teach" based on the

factors in *Morrison v. State Board of Education* (1969) 1 Cal.3d 214, 229,[3] the ALJ considered whether Gensler's refusal to follow regulations was persistent. The ALJ concluded: "Although the evidence established that [Gensler] violated the harassment/discrimination rules in the course of a single school year, the violations were permeated with an attitude of continued insubordination or willful disobedience to the [D]istrict's directives. As such, the continuous use of inappropriate language that violated [D]istrict harassment policies was persistent."

### 2. Section 87732, Subdivision (d)

The ALJ also concluded Gensler was evidently unfit for service under section 87732, subdivision (d). The ALJ applied the *Morrison* factors and found Gensler was unfit to teach. The ALJ then considered whether the unfitness was "'evident.'" The ALJ explained: "The single most important consideration is that the [D]istrict provided [Gensler] with multiple opportunities to remediate his behavior. [Gensler] obstinately refused, believing that all the complaints against him were meritless. [Gensler] even ignored the simple directive to refrain from using profanity with students

---

[3] "In determining whether the teacher's conduct thus indicates unfitness to teach the board may consider such matters as the likelihood that the conduct may have adversely affected students or fellow teachers, the degree of such adversity anticipated, the proximity or remoteness in time of the conduct, the type of teaching certificate held by the party involved, the extenuating or aggravating circumstances, if any, surrounding the conduct, the praiseworthiness or blameworthiness of the motives resulting in the conduct, the likelihood of the recurrence of the questioned conduct, and the extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers." (*Morrison v. State Board of Education, supra*, 1 Cal.3d at p. 229, fns. omitted.)

because he did not believe the [D]istrict had the authority to issue him such a directive."

The ALJ elaborated: despite Gensler's several "positive attributes," he nevertheless "expressed no remorse or acceptance of responsibility for his conduct. He maintains the erroneous position that in order to be effective, he needs to maintain the conversational, and often crude, language that one might overhear in a student dining room or on the sports field. The fact is, if [Gensler] elected to do so, he could engage his students with the material, maintain participation, and exhibit the professionalism expected of a professor with [Gensler]'s academic pedigree. There are plenty of examples of educators across many different media platforms who do just that. [Gensler]'s belief that the binary decision of being 'off-the-wall Jerry Springer' or 'boring textbook-reading Mr. Rogers' is simply a fallacy. Finally, and most concerning, is the way [Gensler] dealt with students he deemed to be a problem. [Gensler] might be correct that most complaints were from 'D' or 'F' students. But the responsibility of a college professor is for *all* students—not just the ones who do well or personally relate to [Gensler]. [Gensler]'s often derisive and dismissive attitude to those who questioned his authority highlight the fact that he lacks the temperament to be in a community college classroom. Accordingly, overwhelming evidence established that [Gensler] does not have the temperament to comport his behavior to the professional standards expected by the [D]istrict and is thus evidently unfit for service."

3. The ALJ Rejected Gensler's Defenses

Notwithstanding Gensler's defenses, the ALJ found the District provided Gensler a timely evaluation under section 87663 and therefore the District complied with section 87661 when it terminated Gensler's

9

employment. The ALJ determined, even if the District did not strictly comply with section 87661 or the District's master agreement with the faculty association, the doctrine of substantial compliance applied to the instructor evaluation requirements. Additionally, the ALJ rejected Gensler's argument the District violated his First Amendment rights.

## II.

### PETITION FOR WRIT OF MANDATE

"In January 2021, Gensler filed a [petition for writ of mandate], naming the Board and the District as respondents, in which he sought the issuance of a writ 'to vacate the termination decision of [the ALJ] and order the reinstatement of Gensler with back pay.' The petition asserted six causes of action.

"In the first cause of action, Gensler asserted respondents provided defective notice and lacked jurisdiction, [because they violated:] sections 87671, subdivision (a) (failure to conduct a current evaluation)[;] 87663, subdivision (c) (failure to include a peer review)[;] 87663, subdivision (g) (failure to include student evaluations)[;] 87031, subdivision (b)(1) (failure to allow Gensler to provide written comments to derogatory material placed in his personnel file which was used in the termination process)[;] 87680 (considering and relying upon evidence older than four years)[;] and 87672 (failure to provide notice of the complete and precise decision of the governing board and the reasons for the termination).

"In the second cause of action in the petition, Gensler asserted the ALJ erred by concluding Gensler had engaged in unprofessional conduct justifying the termination of his employment.

10

"In the third cause of action, Gensler asserted the ALJ erred by concluding Gensler's statements were not protected by the First Amendment to the United States Constitution and his right to academic freedom.

"In the fourth cause of action, Gensler asserted he was deprived of a fair trial. He asserted the ALJ abused his discretion by precluding opening statements and closing argument, committing evidentiary error, relying on cases the Board had not cited in its briefing, ignoring pretrial motions and the Board's alleged discovery abuses, and denying Gensler's requests for sanctions and continuances.

"In the fifth and sixth causes of action, Gensler asserted the ALJ's findings of Gensler's "'evident unfitness'" and "'persistent failure to follow rules,'" respectively, should be reversed.

"In the petition's prayer for relief, Gensler stated he "respectfully prays that the court enter judgment against [r]espondents as follows:

"'1. For a [writ of mandate] to be issued under Code of Civil Procedure section 1094.5 under seal of this court, ordering the Board . . . .

"'a. to reinstate . . . Gensler as a full-time tenured faculty member of Saddleback College[;] and

"'b. to reimburse . . . Gensler for lost wages and benefits arising from this action[;]

"'2. For . . . Gensler's costs in this action, including attorneys' fees[;]

"'and

"'3. For such other relief as the court considers just and proper." (Some capitalization omitted.)

"Respondents filed an answer to the petition." (*Gensler v. Bd. of Trustees of the South Orange County Community College Dist.* (Aug. 22, 2023, No. G061503) [nonpub. opn.].)

## III.

### TRIAL COURT'S DECEMBER 2021 ORDER AND APPEAL

In December 2021, after considering the parties' evidence and arguments, Judge Derek W. Hunt remanded the matter to respondents to perform a peer review evaluation. Gensler appealed, and a panel of this appellate court held the order was not appealable. (*Gensler v. Board of Trustees of the South Orange County Community College District, supra,* G061503.)

## IV.

### TRIAL COURT'S OCTOBER 2023 AND JANUARY 2024 MINUTE ORDERS

In an October 2023 minute order, Judge Kimberly A. Knill noted, during a status conference, both parties asserted no additional briefing was necessary and that she would not remand for a peer review.[4] In a January 2024 minute order, Judge Knill took the matter under submission, explaining no argument was required.

---

[4] In April 2023, Judge Knill was assigned to the present case, due to the retirement of Judge Hunt. As the prior judge was unavailable, Judge Knill was able to reconsider Judge Hunt's prior ruling. (See *In re Marriage of Oliverez* (2015) 238 Cal.App.4th 1242, 1247 ["A trial court's discretion to reconsider another judge's prior ruling is necessarily narrow and usually only appropriate when the prior judge is unavailable"].)

V.

TRIAL COURT'S DENIAL OF PETITION FOR WRIT OF MANDATE

In February 2024, the trial court denied the petition for writ of mandate. While exercising its independent judgment on the evidence, the court concluded the following. Respondents did not act in excess of their jurisdiction because the ALJ properly found respondents substantially complied with the evaluation requirement in section 87671. The ALJ did not abuse his discretion by considering Gensler's unprofessional conduct in reviewing the charge for evident unfitness to teach. The ALJ did not abuse his discretion by rejecting Gensler's First Amendment and academic freedom arguments. Gensler had a fair trial before the ALJ. The ALJ did not abuse his discretion by finding Gensler was evidently unfit for service under section 87732, subdivision (d) and Gensler persistently failed to follow the rules under section 87732, subdivision (f). The court entered judgment in favor of respondents.

Gensler timely appealed.

DISCUSSION

I.

GOVERNING STATUTORY SCHEME

"The terms and conditions of employment for community college employees are governed by a comprehensive statutory scheme set forth in the Education Code. (§ 87660 et seq. [governing 'the evaluation of, the dismissal of, and the imposition of penalties on, community college faculty'].) Contract or regular employees 'may be dismissed or penalized for one or more of the grounds set forth in Section 87732.' (§ 87667.) 'A "regular" employee is . . . one who has achieved tenure. "Contract" status is the first step toward tenure.' [Citation.] Section 87732 provides multiple independent bases upon which an

13

employer may take action against an employee." (*Ricasa v. Office of Administrative Hearings* (2018) 31 Cal.App.5th 262, 272 (*Ricasa*).) The relevant bases here are: "[e]vident unfitness for service" (§ 87732, subd. (d)) and "[p]ersistent violation of, or refusal to obey, the school laws of the state or reasonable regulations prescribed for the government of the community colleges by the board of governors or by the governing board of the community college district employing him or her" (*Id.*, subd. (f)).

"The governing board determines whether an employee is to be dismissed or penalized and whether the dismissal or penalty shall be imposed immediately or postponed. (§ 87669.) The employee 'may be dismissed or penalized if one or more of the grounds set forth in Section 87732 are present and the following are satisfied: [¶] (a) The employee has been evaluated in accordance with standards and procedures established in accordance with the provisions of this article. [¶] (b) The district governing board has received all statements of evaluation which considered the events for which dismissal or penalties may be imposed. [¶] (c) The district governing board has received recommendations of the superintendent of the district and, if the employee is working for a community college, the recommendations of the president of that community college. [¶] (d) The district governing board has considered the statements of evaluation and the recommendations in a lawful meeting of the board.' (§ 87671.)

"'If a governing board decides it intends to dismiss or penalize a contract or regular employee, it shall deliver a written statement, duly signed and verified, to the employee setting forth the complete and precise decision of the governing board and the reasons therefor.' (§ 87672.) The employee then has 30 days to object to the governing board's decision. (§ 87673.)

14

"If the parties do not agree to an arbitrator (§ 87674), then the governing board must certify the matter to the [Office of Administrative Hearings] (§ 87678). An ALJ conducts proceedings 'in accordance with Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code.' (§ 87679.) 'The written notice delivered to the employee pursuant to Section 87672 shall be deemed an accusation. The written objection of the employee delivered pursuant to Section 87673 shall be deemed the notice of defense.' (§ 87679.)

"The ALJ must determine whether cause exists to dismiss or penalize the employee and whether to dismiss or penalize the employee. (§ 87680.) The governing board or the employee may petition the court for review of the ALJ's decision. (§ 87682.)" (*Ricasa, supra*, 31 Cal.App.5th at pp. 272–273.)

## II.

### STANDARD OF REVIEW

*A. Trial Court's Standard of Review of the Administrative Decision*

A trial court exercises its independent judgment in reviewing an administrative decision. (§ 87682.) "In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817.) "[T]he presumption provides the trial court with a starting point for review—but it is only a presumption, and may be overcome. Because the trial court ultimately must exercise its own independent judgment, that court is free to substitute its own findings after first giving due respect to the agency's findings." (*Id.* at p. 818.)

15

*B. Standard of Review on Appeal*

On appeal, "[w]e review the trial court's determination under the substantial evidence test."[5] (*Ricasa, supra*, 31 Cal.App.5th at p. 282.) "Our focus is on the *trial court's* findings." (*Shenouda v. Veterinary Medical Bd., supra*, 27 Cal.App.5th at p. 512.) Therefore, we do not consider any of Gensler's arguments asserting the ALJ erred.

"[T]o the extent pure questions of law (e.g., jurisdiction) were decided at the trial court upon undisputed facts, a de novo standard will apply at the appellate level." (*Anserv Ins. Services, Inc. v. Kelso* (2000) 83 Cal.App.4th 197, 204.) "''A challenge to the procedural fairness of the administrative hearing is reviewed de novo on appeal because the ultimate determination of procedural fairness amounts to a question of law.''" (*Boermeester v. Carry* (2023) 15 Cal.5th 72, 85.)

III.

THE DISTRICT SUBSTANTIALLY COMPLIED WITH SECTION 87671

Gensler argues respondents acted in excess of their jurisdiction because they were required to conduct a performance evaluation before terminating Gensler's employment. "A . . . regular employee may be dismissed . . . if one or more of the grounds set forth in Section 87732 are present and" several criteria "are satisfied," including, inter alia: "The employee has been evaluated in accordance with standards and procedures

---

[5] On appeal, Gensler presents no substantial evidence arguments. His appeal is focused on how the ALJ erred and how the trial court did not conduct the proper judicial review of the ALJ's findings.

established in accordance with the provisions of this article."[6] (§ 87671, subd. (a).) Pursuant to these standards and procedures, "[r]egular employees shall be evaluated at least once in every three academic years." (§ 87663, subd. (a).) "Evaluations shall include, but not be limited to, a peer review process." (*Id.*, subd. (c).) "It is the intent of the Legislature that faculty evaluation include, to the extent practicable, student evaluation." (*Id.*, subd. (g).)

"[F]aculty evaluation procedures may be negotiated as part of the collective bargaining process" (§ 87663, subd. (e)), and "the evaluation shall be conducted in accordance with the standards and procedures established by the rules and regulations of the governing board of the employing district" (*id.*, subd. (b)). The master agreement here provides a somewhat different evaluation cycle than section 87663, requiring the District to start the evaluation process every three years (rather than academic years): "1. The vice president or dean will initiate the tenured faculty evaluation process every three . . . years. [¶] 2. The evaluation process must be completed within one year of its initiation, or the process must begin anew."

Here, Gensler's last evaluation covered the period between October 17, 2012, and November 2, 2015. As the master agreement requires the evaluation process to be initiated every three years, his next evaluation needed to be initiated no later than November 2, 2018. Respondents do not represent they initiated the evaluation process by then. The District therefore

---

[6] "'Regular employee' or 'tenured employee' means an employee of a district who is employed in accordance with subdivision (c) of Section 87608, subdivision (c) of Section 87608.5, or Section 87609." (§ 87661, subd. (d).)

17

did not adhere to the evaluation procedures outlined in the master agreement and statute.

Nonetheless, we find respondents substantially complied with the statute (and master agreement). "The rules governing the doctrine of substantial compliance are well settled. [Citation.] As it is used in the decisions of this state, the doctrine excuses literal noncompliance only when there has been 'actual compliance in respect to the substance essential to every reasonable objective of the statute.' [Citations.] Thus, the doctrine gives effect to our preference for substance over form, but it does not allow for an excuse to literal noncompliance in every situation." (*Robertson v. Health Net of California, Inc.* (2005) 132 Cal.App.4th 1419, 1430.)

*Miller v. Chico Unified School Dist.* (1979) 24 Cal.3d 703 (*Miller*) is instructive. In early 1976, the plaintiff, a junior high school principal, received notice of his reassignment to a teaching position. (*Id.* at p. 709.) He sought reinstatement to his position as principal, arguing, inter alia, the school board failed to comply with section 44664 (*Miller*, at p. 706), which is analogous to section 87663. "Section 44664, a provision of the Stull Act (former §§ 13485–13490, now §§ 44660–44665), provides: 'Evaluation and assessment of the performance of each certificated employee shall be made on a continuing basis, at least once each school year for probationary personnel, and at least every other year for personnel with permanent status. The evaluation shall include recommendations, if necessary, as to areas of improvement in the performance of the employee. In the event an employee is not performing his duties in a satisfactory manner according to the standards prescribed by the governing board, the employing authority shall notify the employee in writing of such fact and describe such unsatisfactory performance. The employing authority shall thereafter confer with the

18

employee making specific recommendations as to areas of improvement in the employee's performance and endeavor to assist him in such performance.'" (*Id.* at p. 716.) The school board also had guidelines providing "for annual evaluations of supervisory personnel." (*Id.* at p. 717.)

While the trial court in *Miller* found the school board violated section 44664 by neglecting to notify the plaintiff in writing that his performance was unsatisfactory, the California Supreme Court held "the school board substantially complied with the Stull Act's mandate that the board fix performance guidelines for its certificated personnel, evaluate plaintiff in light of such guidelines, inform plaintiff of the results of any evaluation, and suggest to plaintiff ways to improve his performance." (*Miller, supra*, 24 Cal.3d at p. 717.) The Supreme Court explained the school board had evaluated the plaintiff annually in 1973, 1974, and 1975 in accordance with the guidelines. (*Ibid.*) In the 1974 evaluation, the school board suggested areas of improvement. (*Ibid.*) In April 1975, the school board also informed the plaintiff that his performance was a concern and reiterated suggestions for improvement. (*Ibid.*) In the June 1975 evaluation, the school board provided written notice of plaintiff's unsatisfactory conduct and gave his supervisors an opportunity to recommend improvements. (*Ibid.*) The school board scheduled an evaluation for the 1975 to 1976 school year, but the plaintiff refused to participate. (*Ibid.*) Nevertheless, the school board met with him at least twice and suggested strategies to improve. (*Ibid.*) Thus, the "plaintiff knew of the board's close attention to his performance and of specific ways in which he could alleviate their concerns." (*Ibid.*)

The Supreme Court rejected the trial court's "overly restrictive interpretation of the requirements of section 44664." (*Miller, supra*, 24 Cal.3d at p. 717.) The Supreme Court considered the purpose of section 44664 and

19

determined: "The obvious objective of the Legislature was to protect the individual employee, in this case, the principal of a high school, against arbitrary action by the institution, here the school board, in order to preserve the individual's rights against their improper severance. The individual would be helpless against the institution's wrongful reassigning him to an inferior position unless he had the opportunity to know, and if possible, to counter the reasons for it. At the same time if the trial court in the present case should find that the board in any event, even in the absence of unproven accusations against the principal's conduct, would still have reassigned him, for its own good reasons, the principal cannot justly complain." (*Id.* at p. 718.)

Here, as the trial court found, respondents gave Gensler several notices of his unsatisfactory performance. First, in July 2016, the District gave Gensler a "90-Day Notice of Unprofessional Conduct and/or Unsatisfactory Performance—Notice to Correct Deficiencies." The notice cited administrative regulation 4000.5, inter alia. It informed Gensler regarding unprofessional and unsatisfactory performance due to "threatening and derogatory comments to [a] student," who was a military veteran, and "disparaging remarks based on students' religious views." The District issued the following directive to assist Gensler "in overcoming these deficiencies: "A. You will immediately stop your unprofessional conduct. [¶] B. You will treat all students with respect, dignity, and civility. [¶] C. You will neither retaliate against nor confront students or employees concerning the aforementioned complaints. [¶] D. You will attend anti-discrimination and harassment training of at least two hours to be provided by or approved by the District at a future date. [¶] E. You will adhere to all District policies and regulations referred to in this notice. [¶] F. You will establish a classroom environment conducive to learning; model effective critical thinking by being

open to differences of opinion; invite students to think independently; stimulate your students' interest and desire to learn; provide a positive learning environment for all student populations; and demonstrate sensitivity in working with students and employees with diverse backgrounds and needs." The District warned: "Your performance will be monitored each week to evaluate whether you have improved with respect to the problems outlined in this notice. Should you continue to demonstrate the types of behavior discussed in this notice, you will be subject to further disciplinary action, up to and including dismissal from employment."

Second, in October 2016, Dean Cadence Wynter met with Gensler regarding "an informal student complaint" and memorialized the meeting in a memorandum to Gensler. In the memorandum, Wynter wrote the complainant alleged Gensler "demean[ed] and use[ed] derogatory comments throughout [his] class sessions." Wynter also told Gensler he had embarrassed a student by admonishing her in front of the class for incorrectly writing her name. Gensler replied by stating he "knew who the student was, that she was 'Chinese' and that she was 'hyper sensitive and pampered.'" Wynter advised: "Calling the student 'pampered' is derogatory and subjective. While I know this is not an isolated incident, I expect it to be the last one. Effective immediately, you are to treat students with respect and not [publicly] castigate them. More importantly, you are not to make assumptions about students based on their national origin."

Third, in September 2017, Denise Whittaker, interim president of Saddleback College, met with Gensler, after the Board denied an appeal of a discrimination and harassment claim against him. She memorialized the meeting in a memorandum to Gensler. She wrote the Board wanted to ensure Gensler "understood the seriousness of [the] situation," and Whittaker

21

offered to discuss it with him. Whittaker warned Gensler: "I am concerned that if another complaint against you occurs which results in yet another finding of unprofessional conduct (even if the evidence does not rise to a level of discriminatory behavior), I am concerned that the District would have no choice but to take disciplinary action, up to and including termination, against you." She gave him a copy of section 87732. Whittaker recorded: "After much discussion, you assured me that you understand that I was alerting you to potential future action if student complaints result in findings of unprofessional conduct."[7]

This history shows Gensler knew respondents were monitoring his performance, particularly his insensitive and inappropriate language in the classroom. Respondents warned him at least a couple of times he could face disciplinary action if another complaint occurred and provided opportunities to address his conduct. Here, as in *Miller, supra*, 24 Cal.3d at page 718, "[t]he obvious objective of the Legislature was to protect the individual employee . . . against arbitrary action by the institution . . . in order to preserve the individual's rights against their improper severance." Gensler cannot assert the charges surprised him or respondents failed to give him an opportunity to fix his problematic conduct. It is not reasonably

---

[7] We also note, in Gensler's 2012 to 2015 evaluation, which he signed in December 2015, he was "advised to be more thoughtful about some of his public comments to students that can and have [led] to student complaints."

possible Gensler would have received a more favorable outcome had the District performed an evaluation by November 2018.[8]

IV.

THE TRIAL COURT CONDUCTED THE PROPER JUDICIAL REVIEW OF THE ALJ'S FINDINGS UNDER SECTION 87732, SUBDIVISION (D)

Gensler argues the trial court failed to conduct a proper judicial review of the ALJ's finding that Gensler was evidently unfit for service under section 87732, subdivision (d). He first asserts the court provided a "list of distorted allegations, including several even [the ALJ] had rejected, without citation to any supporting evidence." Gensler suggests this list misrepresents the ALJ's findings. But as he recognizes, it is merely a list of allegations, not findings. Even if the specified allegations are "distorted," the purported distortion did not impact the court's analysis of the ALJ's findings.

Gensler next asserts: "There is no acknowledgement that Gensler had contested the allegations in the bullet list, or that [the ALJ] had rejected several as either false or improper attempts to punish acceptable speech, much less any attempt to address and resolve the conflicting evidence. There is not a single citation to the hearing transcripts to support [the trial court]'s statements, any credibility determinations, or factual findings." Gensler does not cite any legal authority requiring the trial court to include such

---

[8] We note the issue of substantial compliance was properly before the trial court. The District raised the issue, citing *Miller*, in its posthearing briefs before the ALJ, and the ALJ addressed the issue in the administrative decision. Contrary to Gensler's assertions, the court did not concoct its own substantial compliance theory. Respondents argued in the court the doctrine of substantial compliance applied, citing *Miller*. In its order, the court drew from *Miller* for its substantial compliance analysis. Gensler had opportunities to address the doctrine of substantial compliance, including here before us.

23

information in its order. We therefore deem this argument forfeited. (See *Pinter-Brown v. Regents of University of California* (2020) 48 Cal.App.5th 55, 95 (*Pinter-Brown*) ["When legal argument is not supported by citation to legal authority on a particular point, 'we may treat the point as forfeited and pass it without consideration'"].)

Gensler also contends the trial court failed to review the evidence because the court's order lacks citations to the record and provides a list of "distorted and disproven allegations." But these do not necessarily indicate the court failed to consider the evidence. Something more would be needed. For example, in *Ocheltree v. Gourley* (2002) 102 Cal.App.4th 1013, 1017–1018, a case cited by Gensler, it was apparent the court did not review the administrative record, because it made its decision on a petition for writ of mandate before the administrative record was prepared.

The trial court here reviewed the ALJ's findings and, after exercising its independent judgment, found the ALJ did not err. The court considered whether the ALJ properly evaluated the *Morrison* factors and the ALJ's examination of whether Gensler's unfitness was evident. Nothing in the record shows the court improperly reviewed the ALJ's findings pursuant to section 87732, subdivision (d).

V.

THE TRIAL COURT CONDUCTED THE PROPER JUDICIAL REVIEW OF THE ALJ'S FINDINGS UNDER SECTION 87732, SUBDIVISION (F)

Gensler argues the trial court failed to perform a proper judicial review of the ALJ's finding that Gensler persistently refused to follow the rules under section 87732, subdivision (f). He asserts: "A proper review would have (1) construed the District's regulation and identified its essential elements, (2) examined the entire administrative record, including the

24

hearing testimony, to determine the facts, (3) identified and resolved the factual disputes and explained the bases for those determinations, and then (4) analyzed whether the factual findings satisfied the criteria of the regulation." Except for number "(2)," Gensler does not cite any legal authority in support of his assertions. We therefore deem them forfeited (see *Pinter-Brown, supra*, 48 Cal.App.5th at p. 95), except for number "(2)," which we discuss next.

In support of his contention the trial court failed to consider all the evidence, he asserts the court's order did not include any citations to the hearing transcript, nor did it acknowledge factual disputes or evidence in his favor. But, as we explained *ante*, these do not necessarily show the court did not consider the evidence.

The trial court here acknowledged the ALJ's findings and concluded: "The evidence reflects [Gensler]'s conduct establishes a persistent violation of, or refusal to obey the District rules." The court also concluded: "[Gensler] has not demonstrated the ALJ committed legal error constituting an abuse of discretion, or that the findings are not supported by the weight of the evidence." These statements indicate the court considered the evidence in rendering its decision and, after reviewing the administrative decision under the independent judgment test, it found the ALJ did not err.

VI.

GENSLER'S CONSTITUTIONAL ARGUMENTS FAIL

Gensler argues the District violated his First Amendment rights, and the trial court did not conduct the required judicial review of the

25

administrative decision.[9] He also appears to argue administrative regulation 4000.5 is unconstitutionally vague. We disagree.

*A. Gensler Fails to Show Unconstitutional Vagueness*

We begin by noting Gensler's arguments on unconstitutional vagueness are somewhat ambiguous. In his discussion of the First Amendment in his opening brief, Gensler starts by stating general First Amendment principles and then asserts in a subheading: "Vague Regulations Addressing Sexual Harassment And Racial Discrimination Are Not Valid Substitutes For A Constitutional Language Policy." He next summarizes *Cohen v. San Bernardino Valley College* (9th Cir. 1996) 92 F.3d 968 (*Cohen*).

In *Cohen*, a tenured professor at a community college taught an English class. (*Cohen, supra*, 92 F.3d at p. 970.) A student, Ms. M., was offended with the professor's "repeated focus on topics of a sexual nature, his use of profanity and vulgarities, and by his comments which she believed were directed intentionally at her and other female students in a humiliating and harassing manner." (*Ibid.*) In this class, the professor held a "discussion on the issue of pornography and played the 'devil's advocate' by asserting controversial viewpoints." (*Ibid.*) He disclosed "he wrote for Hustler and Playboy magazines and he read some articles out loud in class." (*Ibid.*) He

---

[9] Gensler asserts the District violated his academic freedom. But Gensler does not provide any substantive arguments. "'[W]here a point is merely asserted by [appellant] without any [substantive] argument of or authority for its proposition, it is deemed to be without foundation and requires no discussion.' [Citation.] 'Issues do not have a life of their own: if they are not raised or supported by [substantive] argument or citation to authority, we consider the issues'" forfeited. (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 418.) We therefore consider this argument forfeited.

then assigned his students to compose "essays defining pornography." (*Ibid.*) Ms. M. asked for a different assignment, but the professor refused. (*Ibid.*) She stopped attending the class and failed it. (*Ibid.*) She filed a complaint regarding the professor's statements and conduct asserting the professor sexually harassed her. (*Ibid.*)

The community college had a new sexual harassment policy, providing: "Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal, written, or physical conduct of a sexual nature. [I]t includes, but is not limited to, circumstances in which: [¶] 1. Submission to such conduct is made explicitly or implicitly a term or condition of a student's academic standing or status. [¶] 2. Such conduct has the purpose or effect of unreasonably interfering with an individual's academic performance or creating an intimidating, hostile, or offensive learning environment. [¶] 3. Submission to or rejection of such conduct is used as the basis for academic success or failure." (*Cohen, supra*, 92 F.3d at pp. 970–971.) The community college determined the professor "engaged in sexual harassment which unreasonably interfered with an individual's academic performance and created an intimidating, hostile, or offensive learning environment," and it imposed certain disciplinary penalties. (*Cohen, supra*, 92 F.3d at p. 971.)

The Ninth Circuit Court of Appeals held the community college's sexual harassment policy was unconstitutionally vague as applied to the professor. (*Cohen, supra*, 92 F.3d at p. 972.) It explained: "There are three objections to vague policies in the First Amendment context. First, they trap the innocent by not providing fair warning. Second, they impermissibly delegate basic policy matters to low level officials for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and

27

discriminatory application. Third, a vague policy discourages the exercise of [F]irst [A]mendment freedoms." (*Ibid.*) In *Cohen*, the professor's "speech did not fall within the core region of sexual harassment as defined by the policy. Instead, officials of the college, on an entirely ad hoc basis, applied the policy's nebulous outer reaches to punish teaching methods that Cohen had used for many years. Regardless of what the intentions of the officials of the college may have been, the consequences of their actions can best be described as a legalistic ambush. Cohen was simply without any notice that the policy would be applied in such a way as to punish his longstanding teaching style—a style which, until the college imposed punishment upon Cohen under the policy, had apparently been considered pedagogically sound and within the bounds of teaching methodology permitted at the college." (*Ibid.*, capitalization omitted.) Because the court held the policy was unconstitutionally vague as applied to the professor, it "decline[d] to define today the precise contours of the protection the First Amendment provides the classroom speech of college professors." (*Id.* at pp. 971–972.)

After summarizing *Cohen* in his opening brief, Gensler asserts: "the District's 'hostile environment' regulation requires that the District prove the existence of numerous elements, including (1) a specific victim, who must be (2) subjectively and (3) objectively offended by conduct which (4) must permeate the class and not be (5) related to the curriculum or (6) protected by the First Amendment. As a harassment policy, it may be reasonably detailed. However, it is not intended to be a policy governing speech and it does not acknowledge, or attempt to comply with, the constitutional strictures of such regulations."

"'[T]o demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to

28

the record.' [Citation.] 'We are not obliged to make other arguments for [appellant] [citation], nor are we obliged to speculate about which issues counsel intend to raise.' [Citations.] We may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt.'" (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277.)

Here, Gensler does not explain why the regulation does not "attempt to comply with[] the constitutional strictures of such regulations," nor does he explicitly connect his assertions to *Cohen*. His assertions do not constitute a cognizable argument that the District violated Gensler's First Amendment rights. We therefore deem these arguments forfeited. (See *Hernandez v. First Student, Inc., supra*, 37 Cal.App.5th at p. 277.)

Nonetheless, elsewhere in his opening and reply briefs, it appears Gensler is arguing the District's harassment policy in administrative regulation 4000.5 is unconstitutionally vague, because it resembles the language in the sexual harassment policy in *Cohen*. In particular, Gensler points out both policies contain language regarding how the offending conduct "unreasonably interfere[s]" with learning. (*Cohen, supra*, 92 F.3d at p. 971.)

"'Vagueness doctrine is an outgrowth not of the First Amendment, but of the [d]ue [p]rocess [c]lause of the Fifth Amendment.' [Citation.] '[T]he underlying concern is the core due process requirement of adequate *notice*.'" (*Wilson v. San Luis Obispo County Democratic Central Com.* (2009) 175 Cal.App.4th 489, 499.) "A law is unconstitutionally vague if it fails to meet two basic requirements: (1) The regulations must be sufficiently definite to provide fair notice of the conduct proscribed; and (2)

29

the regulations must provide sufficiently definite standards of application to prevent arbitrary and discriminatory enforcement." (*Snatchko v. Westfield LLC* (2010) 187 Cal.App.4th 469, 495.) "'Only a reasonable degree of certainty is required.' [Citation.] If a reasonable and practical construction can be given, the law will not be held void for uncertainty." (*Ibid.*)

As the trial court found, unlike the policy in *Cohen*, administrative regulation 4000.5 specifies in significant detail what conduct constitutes harassment. Administrative regulation 4000.5 defines prohibited verbal harassment: "Inappropriate or offensive remarks, slurs, jokes or innuendoes based on a person's race, gender, sexual orientation, or other protected status. This may include, but is not limited to, inappropriate comments regarding an individual's body, physical appearance, attire, sexual prowess, marital status, or sexual orientation; unwelcome flirting or propositions; demands for sexual favors; verbal abuse, threats or intimidation; or sexist, patronizing or ridiculing statements that convey derogatory attitudes based on gender, race, nationality, sexual orientation or other protected status." In conjunction with the definitions of prohibited harassment, administrative regulation 4000.5 also explains in sufficient detail what constitutes a hostile academic environment. It specifies a hostile academic environment exists "where it is permeated by sexual innuendo; insults or abusive comments directed at an individual or group based on gender, race nationality, sexual orientation or other protected status; or gratuitous comments regarding gender, race, sexual orientation, or other protected statuses that are not relevant to the subject matter of the class or activities on the job." And, unlike in *Cohen, supra*, 92 F.3d at page 972, where the professor had no notice the new sexual harassment policy "would be applied in such a way as to punish his longstanding teaching style," Gensler

30

received notice that administrative regulation 4000.5 could apply to him in July 2016 and additional notices warning him of his conduct. We therefore find *Cohen* inapplicable here.

*B. Gensler Fails to Demonstrate How the Trial Court Erred*

Gensler next contends the trial court erred for several reasons. First, he asserts: "While [the court] cited a small portion of the regulation [citation], [the court] made no effort to identify the required elements, or what evidence supposedly established the existence of each element, or that no defenses applied." Gensler does not cite any legal authority in support. We therefore consider this argument forfeited. (See *Pinter-Brown, supra*, 48 Cal.App.5th at p. 95.)

Second, Gensler argues the trial court's distinguishing of *Cohen* from the present case (i.e., the District's regulation specified in greater detail proscribed conduct compared with the policy in *Cohen*) "has no basis in fact." He claims, "*Cohen* does not provide the full text of the San Bernardino Community College District policy, so one cannot make the comparison." This argument is misguided. Nothing in *Cohen* suggests the *Cohen* court did not set forth the entire sexual harassment policy in its decision.

Third, Gensler contends: "[T]he issue of whether the District's regulation is *more* detailed than that in *Cohen* is irrelevant. The issue is whether the District's regulation is *sufficiently* detailed to pass constitutional standards to be employed as a language policy. [The trial court] does not address that issue. [The court]'s statement that Gensler had not provided any legal authority that a language policy is required is demonstrably incorrect, as Gensler cited and discussed *Cohen* in his trial brief." This contention is misguided too. The relevant issue in *Cohen* was whether the sexual harassment policy was unconstitutionally vague. As the court correctly

31

observed, *Cohen* does not address language policies. Nor did *Cohen* address whether the First Amendment protected the professor's speech. (*Cohen, supra*, 92 F.3d at p. 972.)

Fourth, Gensler argues the trial court misplaced its reliance on *Demers v. Austin* (9th Cir. 2012) 746 F.3d 402 and *Pickering v. Board of Education* (1968) 391 U.S. 563, because these cases involved "out-of-classroom speech." That distinction is unpersuasive. *Demers* suggests the *Pickering* test applies to teaching: "We conclude that *Garcetti* [*v. Ceballos* (2006) 547 U.S. 410] does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor. We hold that academic employee speech not covered by *Garcetti* is protected under the First Amendment, using the analysis established in *Pickering*."[10] (*Demers*, at p. 412.)

*C. Gensler Fails to Establish a First Amendment Violation*

Even if the trial court committed error, Gensler does not offer any substantive arguments explaining how the District violated the First Amendment. In Gensler's opening brief, under the heading regarding First Amendment violations, he does not identify any purported protected speech or conduct under the First Amendment, except two: his statement concerning Iranian women "'dress[ing] like hookers'" and his comment regarding a

---

[10] "The *Pickering* test has two parts. First, the employee must show that his or her speech addressed 'matters of public concern.' [Citations.] Second, the employee's interest 'in commenting upon matters of public concern' must outweigh 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" (*Demers v. Austin, supra*, 746 F.3d at p. 412.)

student's physical appearance and attire during a jail tour. But he does not provide any substantive argument with citation to authority. Additionally, in his reply brief, under the heading regarding First Amendment violations, he asserts an additional instance of purported protected conduct: wearing a jacket with a Playboy logo. In support, he cites his opening brief and *Tinker v. Des Moines School Dist.* (1969) 393 U.S. 503, but he fails to explain how that authority applies here.[11] We therefore decline to address these arguments.[12] (See *Doe v. McLaughlin* (2022) 83 Cal.App.5th 640, 654.)

## VII.

### GENSLER'S BIAS AND FAIRNESS ARGUMENTS ARE UNAVAILING

Gensler presents several arguments regarding bias and fairness. We address them in turn.

*A. The Accusation Complied with Section 87672*

Gensler argues the accusation failed to give fair notice and contains vague allegations. Aside from citing the pertinent statute, section

---

[11] California Rules of Court, rule 8.204(a)(1)(B) requires every brief to "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority." To the extent Gensler believes he presented substantive First Amendment arguments elsewhere in his briefs under other headings, we would disregard such arguments and treat them as forfeited. (See *Tsakopoulos Investments, LLC v. County of Sacramento* (2023) 95 Cal.App.5th 280, 310 ["'Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading'"].)

[12] For the first time in his reply brief, Gensler argues the trial court failed to conduct a First Amendment analysis on each individual statement. We consider this argument forfeited, as "we will not consider matters raised for the first time in the reply brief." (*Sachs v. Sachs* (2020) 44 Cal.App.5th 59, 66.)

87672, Gensler does not cite any authorities, and we are unaware of any authorities addressing this question.

Section 87672 provides in pertinent part: "If a governing board decides it intends to dismiss or penalize a contract or regular employee, it shall deliver a written statement, duly signed and verified, to the employee setting forth the complete and precise decision of the governing board and the reasons therefor."

Here, the accusation was "complete and precise." (§ 87672.) It alleged Gensler "engaged in [e]vident [u]nfitness for [d]uty and [p]ersistent violations of, or refusal to obey, the school laws of the state or reasonable regulations prescribed for the government of the community colleges by the governing board of the [District] as set forth in . . . section 87732." The accusation, which is 25 pages and contains 42 exhibits in support, then spelled out in detail multiple alleged incidents in support, providing general dates and a summary of the conduct. For example, one allegation states: "In Fall 2017 and Spring 2018, Gensler told his . . . students about having taken a prior group of . . . students on a tour of a jail. He spoke about a female student who dressed inappropriately for the jail. In Fall 2017, he told his class that a former female student wore shorts to the jail and the prisoners made noises and whistled at her. During his Spring 2018 class, he told his . . . students that this female former student wore a revealing shirt to the jail tour and that she had a chest 'out to here,' while he cupped his hands out in front of his chest to simulate large breasts. He also said that the former student's pants were 'painted on.' Gensler referred to a female student as 'really good looking,' and her 'boobs just popping out.'" Contrary to Gensler's assertions, the accusation was far from vague.

34

*B. Gensler Forfeited His Argument Regarding Alleged Bias and Time-Barred Allegations*

For the first time on appeal, Gensler argues the ALJ was biased because the ALJ allowed respondents' evidence regarding time-barred allegations in the accusation but prohibited Gensler from introducing evidence to disprove them. Gensler cites section 87680, which provides in relevant part: "No testimony shall be given or evidence introduced relating to matters which occurred more than four years prior to the date of the filing of the notice. Evidence of records regularly kept by the governing board concerning the employee may be introduced, but no decision relating to the dismissal or suspension of any employee shall be made based on charges or evidence of any nature relating to matters occurring more than four years prior to the filing of the notice." (§ 87680.)

"'It is axiomatic that arguments not raised in the trial court are forfeited on appeal.'" (*People v. Graham* (2024) 102 Cal.App.5th 787, 798.) We therefore consider this argument forfeited and decline to address it.

*C. Gensler Fails to Provide Any Citations to Authorities in Support of Several Arguments*

Gensler presents several arguments without citing any legal authorities in support. First, he argues the District stonewalled the discovery process, and this stonewalling prejudiced him. He asserts the District refused to answer over 150 interrogatories. He also asserts he filed a motion to compel discovery, which the ALJ denied, and a pretrial motion for evidentiary sanctions, which the ALJ denied.

Second, Gensler argues the District sought to conceal witnesses and block him from contacting them. He asserts the District refused to disclose the last names of student witnesses for more than three months, and

the District did not disclose the substance of their projected testimony 19 days before trial. He posits, "Through these stratagems and others, [r]espondents successfully prevented Gensler from learning what evidence would be presented against him and preparing to meet it."

Third, Gensler contends the ALJ improperly denied his request to continue the hearing. He asserts he explained to the ALJ that discovery abuses hindered his preparation.

Fourth, Gensler argues the ALJ demonstrated bias and abused his discretion by limiting the number of witnesses he could call but allowing respondents to call as many witnesses as it wished.

Fifth, Gensler asserts the ALJ showed bias and abused his discretion by relying "on his own speculation to bolster his 'evident unfitness' conclusion."[13]

Because Gensler does not provide any legal authorities in support of these arguments, we decline to address them.[14] (See *Pinter-Brown, supra*, 48 Cal.App.5th at p. 95.)

---

[13] Gensler also argues the trial court did not address his unfairness and bias arguments. We disagree. Even if the court did not, we have addressed Gensler's arguments *ante*.

[14] In his reply brief, Gensler contends respondents fail to address the misconduct and therefore concede the existence of the misconduct. Gensler "misperceives his role as appellant: it is" his, rather than respondents', "burden to affirmatively demonstrate error. [Citation.] This burden remains the same whether or not" respondents file "a brief or provide[] argument or authority on an issue." (*Doe v. McLaughlin, supra*, 83 Cal.App.5th at p. 654.) Additionally, in his reply brief, Gensler argues respondents misstate the evidence in the "'Statement of Facts'" of their brief. As Gensler does not cite any legal authorities in support of his argument, we deem them forfeited. (See *Pinter-Brown, supra*, 48 Cal.App.5th at p. 95.)

## DISPOSITION

The judgment is affirmed. Respondents are entitled to costs.

                    MOTOIKE, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


GOODING, J.